KN ENERGY, INC., a Kansas corporation, Petitioner,

v.

The GREAT WESTERN SUGAR COMPANY, a Delaware corporation, Respondent,

and

Northern Natural Gas Co., a Delaware corporation, Defendant.

No. 82SC322.

Supreme Court of Colorado, En Banc.

Jan. 14, 1985.

Rehearing Denied Feb. 4, 1985.

Certiorari Denied June 17, 1985. See 105 S.Ct. 3489.

Bruce D. Pringle, James A. Clark, Baker & Hostetler, Denver, William R. Smith, Hershberger, Patterson, Jones & Roth, Wichita, Kan., John T. Miller, Washington, D.C., for petitioner KN Energy, Inc.

Hardin Holmes, Kenneth L. Starr, Jeffrey Reiman, Holmes & Starr, P.C., Denver, for respondent The Great Western Sugar Co.

John H. Cheatham, III, Washington, D.C., for amicus curiae Interstate Natural Gas Ass'n of America.

DUBOFSKY, Justice.

We granted certiorari to review *Great Western Sugar Company v. Northern Natural Gas Company*, 661 P.2d 684 (Colo.App.1982),[1] in which the Court of Appeals affirmed a district court order granting partial summary judgment on the liability of KN Energy, Inc. (KN) arising from its natural gas supply contract with Great Western Sugar Company (GW), as well as a subsequent jury verdict awarding damages to GW. The Court of Appeals also affirmed a number of the district court's evidentiary rulings. We limited certiorari review to the following issues: (1) whether the district court erred in granting partial summary judgment on liability; and (2) whether the district court erred in excluding from evidence certain expert testimony, a number of Federal Energy Regulatory Commission (Commission) orders,[2] tariffs filed before the Commission by KN, and a number of KN's certificates of public convenience and necessity. We affirm the decision of the Court of Appeals.

KN is a natural gas pipeline company regulated by the Commission under the provisions of the Natural Gas Act. 15 U.S.C. § 717 *et seq.* (1976). Beginning in 1955, KN executed a series of contracts with GW obligating KN to supply the natural gas requirements of GW's sugar processing plants in Ovid and Sterling, Colorado, and Scottsbluff, Nebraska. The initial contract for each site provided that service to GW's boilers and dryers was "interruptible"[3] and that KN

> in its absolute discretion and without liability to Buyer for damages or otherwise shall have the right to and at any time with or without notice may interrupt in whole or in part delivery of natural gas to Buyer as and whenever from time to time Vendor in its sole judgment may deem necessary or expedient for conservation of gas for domestic use or industrial use having prior classification.

This language remained in all KN–GW agreements until March 1973, when KN revised the provision to permit interruptions in order to meet the demands of "users having a higher priority of service."[4]

The agreements between KN and GW also contained a "force majeure" clause, which provided that KN would not be liable for any failure of delivery resulting from any of a series of enumerated supervening

---

1. For a more detailed statement of the facts underlying the controversy before us, see the Court of Appeals' opinion.

2. Until October 1, 1977, the Federal Energy Regulatory Commission was known as the Federal Power Commission. We refer to both agencies as "the Commission."

3. Natural gas service is divided into two categories: "interruptible," permitting cessation of delivery under certain conditions, and "firm," providing for an unconditional delivery obligation. Within the "interruptible" category, gas companies may set a priority among the customers to be interrupted.

4. The change in contractual language reflects KN's adoption of the Commission's suggested "priority of service" categories for curtailment, set forth in Order No. 467 and discussed in Part I.C.2, *infra.* The adoption of these categories did not change GW's priority-of-service ranking under KN's former classification system.

circumstances, including the "order or requirement of competent authority...." In addition, beginning in March 1973, KN inserted the following clause into the contracts:

> This agreement and the respective rights and obligations of the parties hereto are subject to all valid and applicable laws and orders, rules and regulations of duly constituted authorities having jurisdiction or control over the parties, KN's facilities and gas supply, or any transaction contemplated hereby.

KN also supplied gas indirectly to a GW sugar plant in Goodland, Kansas, through a service agreement with the People's Natural Gas Division of the Northern Natural Gas Company (People's-Northern). People's-Northern in turn transmitted the gas to GW under a sales agreement. The service agreement between KN and People's-Northern provided for delivery of

> all the natural gas required by Buyer from day to day up to the amount of the Billing Demand plus ... the Winter Period Demand on a firm basis but in no case is Seller to be required to furnish on any day a volume larger than the then existing Billing Demand plus ... the Winter Period Demand.... Seller also agrees to make deliveries of gas to Buyer in daily volumes in excess of the Billing Demand plus ... the Winter Period Demand on an interruptible basis when gas and facilities are available for making such deliveries.

Billing Demand plus Winter Period Demand comprised the gas supplied on a firm basis. People's-Northern sold only interruptible gas to GW for its Goodland boilers and dryers. The agreement contained clauses concerning force majeure and the effect of administrative regulations similar to the clauses contained in the service agreements between KN and GW.

From 1955 until November 1973, KN determined when to interrupt both its direct and indirect gas service to GW by utilizing what the parties refer to as the "historical twenty-four to thirty-six hour analysis." Under this analysis, KN's gas dispatchers estimated anticipated demand for the coming twenty-four to thirty-six hours on the basis of weather forecasts. If, due to the estimated demand, KN would be unable to maintain sufficient pressure in its pipelines to serve its firm customers, KN would cut off gas supply to its interruptible customers, including GW. In estimating its ability to maintain pipeline pressure, KN did not distinguish among its available sources of gas; pressure was maintained by withdrawing gas from both production and storage fields.

On November 7, 1973, KN instituted a new policy for determining when to sever service to interruptible customers. Under this policy, known as the "storage withdrawal interruption policy," gas deliveries to interruptible customers were to be cut off whenever KN withdrew gas from storage, regardless of KN's ability to maintain pipeline pressure by using gas from storage.[5]

On November 8, 1973, KN representatives met with GW representatives at the GW offices in Denver. At that meeting, KN proposed that the gas sales contract then in effect be terminated and replaced with a new contract in order to incorporate certain changes in the rate schedule; the KN representatives reassured GW that, other than the rate changes, the proposed new contract would be "identical" to the previous agreement. The KN representatives testified that they notified GW at that time of KN's new policy regarding inter-

---

5. Before November 7, 1973, when pressure in a line declined due to demand, KN added delivery from storage to delivery from production fields to increase pipeline pressure. If the demand for gas appeared to be greater than the supply even with the added source, under the twenty-four to thirty-six hour policy KN cut off interruptible customers to keep up pipeline pressure. However, after November 7, 1973, under the storage withdrawal interruption policy, KN cut off interruptible customers whenever it added gas withdrawn from storage to its regular production field withdrawal. The effect of the new policy was to make storage field supplies available only to firm customers, who paid rates higher than the rates paid by the interruptible customers for gas.

ruption of service.[6] One of the GW representatives present at the meeting denied being informed of the change in policy. After the meeting GW executed the new contract to be effective on November 14, 1973. With the exception of the rate changes, the contract adopted was identical to the March 1973 contract.

Early in 1978, GW instituted an action for damages against People's-Northern and KN, alleging that the defendants had breached their contractual gas delivery obligations by instituting the storage withdrawal interruption policy,[7] and that the defendants had fraudulently failed to disclose this change in policy. The defendants moved to refer GW's claims to the Commission, asserting that the Commission had primary jurisdiction over such claims. The district court denied the motion.

In November 1978, GW moved for partial summary judgment against KN on the ground that, as a matter of law, KN had breached its contractual obligations for delivery of gas to the Ovid, Sterling and Scottsbluff plants by unilaterally changing the standard under which it determined when to interrupt delivery. KN filed a cross-motion for summary judgment, contending that the contract unambiguously permitted KN to exercise its discretion in determining what circumstances required interruption of service; that certain Commission orders, as well as KN's tariffs and certificates of public convenience and necessity on file with the Commission, required KN's change in interruption policy; and that because the policy change was lawful, there was no basis for a claim of fraud. The district court granted GW's motion and denied KN's motion, ruling that the plain language of the contract required KN to adhere to its earlier twenty-four to thirty-six hour historical analysis and that the contract did not allow KN to withhold storage gas from GW. The court also de-

termined that the contract language was consistent with the parties' course of dealing from 1964 until November 1973.

GW filed a second motion for partial summary judgment against KN, arguing that KN's storage withdrawal interruption policy was also in breach of its service agreement with People's-Northern and that KN was liable to GW for the breach because GW was a third party beneficiary of the agreement. The district court ruled that, as a matter of law, the service agreement obligated KN to deliver interruptible gas to Northern as long as it was physically able to do so, that the 1973 policy change regarding interruption resulted in a breach of the agreement, and that GW was a direct beneficiary of the service agreement. However, the court denied the motion for summary judgment, ruling that the factual question of whether KN and People's-Northern intended to confer benefits upon GW or a class of customers that included GW was for the jury to decide.

At trial, the court directed a verdict in favor of People's-Northern on the fraud claim at the close of the plaintiff's case-in-chief. Following the presentation of evidence, the jury found that KN was not liable on the fraud claim and that People's-Northern was not liable on the contract claim. The jury awarded GW $775,000 in damages arising from the breach of KN's direct gas sales contracts with GW. The jury also found that GW was an intended beneficiary of the service agreement between KN and People's-Northern, and awarded GW $225,000 in damages arising from breach of the agreement. Following the jury verdicts, the court awarded prejudgment interest and costs to GW, and entered a judgment against KN in the amount of $1,350,229.

The Court of Appeals affirmed the district court's partial summary judgment rul-

6. It is unclear which of the two KN representatives present at the meeting actually informed GW of the new policy at the meeting because each testified that it was the other who did so.

7. Whenever natural gas service was interrupted, GW used more expensive fuel oil in its boilers and dryers. GW alleged that the fuel oil used during the time at issue in its lawsuit, from November 1, 1973 to March 1, 1979, cost $3.7 million more than natural gas.

ing on the issue of contract liability under the direct contracts, its finding that KN had breached the People's-Northern service agreement, and a number of trial rulings excluding certain evidence. KN now argues that the district court erred in granting summary judgment and finding a breach of the service agreement because (1) an issue of material fact remained as to the parties' intent in entering the November 14, 1973 and subsequent agreements, (2) the district court improperly applied the law governing course of dealing and course of performance, and (3) certain Commission orders, tariffs and certificates of public convenience and necessity required KN's change in interruption policy and immunized KN from contract liability. KN also maintains that the district court erred in excluding from evidence at trial many of the same Commission documents as well as a portion of the expert testimony offered by KN. These contentions are without merit, and we affirm the decision of the Court of Appeals.[8]

## I. SUMMARY JUDGMENT

### A. *Disputed Issues of Material Fact*

■ Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c). Because summary judgment is a "drastic remedy," the absence of dispute as to all issues of material fact must be clearly shown, and all doubts as to the presence of disputed facts must be resolved against the moving party. *Ginter v. Palmer & Co.*, 196 Colo. 203, 205–06, 585 P.2d 583, 584 (1978); *Abrahamsen v.*

*Mountain States Telephone and Telegraph*, 177 Colo. 422, 426, 494 P.2d 1287, 1289 (1972). Under these principles, KN contends that the entry of summary judgment in favor of GW on the issue of direct contract liability and the finding of breach under the service agreement were incorrect inasmuch as there existed a disputed issue of material fact: whether KN had notified GW of the change in interruption policy prior to the parties' execution of the November 14, 1973 sales agreement. KN argues that the disputed fact is material to a determination of the parties' intent regarding KN's delivery obligations under the November 14, 1973 agreement and subsequent agreements.

■ The record leaves no doubt that the issue of oral notice is disputed. However, the intent of the parties to a written instrument must be determined primarily from the written terms. *Union Rural Electric Ass'n v. Public Utilities Commission*, 661 P.2d 247, 251 (Colo.1983); *Radiology Professional Corp. v. Trinidad Area Health Ass'n*, 195 Colo. 253, 256, 577 P.2d 748, 750 (1978). "It is only where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement in order to determine the meaning intended by the parties." *Pepcol Manufacturing Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo.1984); *see also Union Rural Electric Ass'n*, 661 P.2d at 251; *Radiology Professional Corp.*, 195 Colo. at 256, 577 P.2d at 750. Whether an ambiguity exists, as a matter of law, is for the court to determine. *Pepcol*, 687 P.2d at 1314; *Radiology Professional Corp.*, 195 Colo. at 256, 577 P.2d at 750. In making this deter-

**8.** In addition, KN claims that state court jurisdiction to award damages for nondelivery of natural gas is preempted by federal law, that the state court had no jurisdiction to award damages in this case because of the "filed rate doctrine," that even if the state court were to retain jurisdiction it must apply federal common law, and that GW failed to exhaust its administrative remedies. None of these matters are fairly raised by the issues upon which we granted certiorari, and we therefore do not consider them. C.A.R. 53(a)(3); *Vigoda v. Denver Urban Renewal Authority*, 646 P.2d 900, 907 (Colo. 1982). We expressly declined to review the intertwined questions of primary jurisdiction, exclusive federal jurisdiction and federal preemption raised in KN's petition for certiorari.

mination, the court may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract. *Pepcol,* 687 P.2d at 1314 n. 3; 4 S. Williston, *A Treatise on the Law of Contracts* §§ 601, 609 and 629 (W. Jaeger ed. 1961) (hereinafter "Williston"). However, the court may not consider the parties' own extrinsic expressions of intent. Williston § 611 at 554–55. In ascertaining the intent of the parties here, therefore, we cannot consider extrinsic evidence unless the contract is ambiguous; neither may we consider the oral notice which was KN's expression of intent in our initial determination of whether an ambiguity exists.[9]

■■■ In our view, as in the opinions of the Court of Appeals and the district court, the written contractual provisions governing KN's delivery obligations are not ambiguous. The clause concerning interruption of service provides that KN had "absolute discretion" to determine when service shall be interrupted; however, the same clause then states that delivery may be cut off only when "KN is required to do so in order to meet the demands" of its higher priority customers. In interpreting the clause, we must attempt "to harmonize and to give effect to all provisions so that none will be rendered meaningless." *Pepcol,* 687 P.2d at 1313; *Union Rural Electric Ass'n,* 661 P.2d at 251. Reading the clause as a whole, it is apparent that KN's discretion in determining when to sever service was limited to the situations in which continuation of service to interruptible customers such as GW could imperil KN's ability to serve its higher priority customers. KN thus was required to predicate interruption upon an analysis—such as the historical twenty-four to thirty-six hour analysis—designed to determine when its ability to serve higher priority customers would be imperiled.

■■■ The provision governing gas delivery under the service agreement between KN and People's-Northern bears a similar meaning. KN argues that because its delivery obligations were limited to "the amount of the Billing Demand plus ... the Winter Period Demand on a firm basis ...," it had unbridled discretion in determining when to sever all service beyond that firm commitment, i.e., all interruptible gas. The same provision, however, also committed KN to delivering interruptible gas whenever "gas and facilities are available for making such deliveries." The clause when read as a whole contemplated a severance of interruptible service only when physical limitations prevented continuation of service.

■■■ The contracts cannot be read to limit KN's sources of supply for interruptible customers to production fields, as KN did under its storage withdrawal interruption policy, which cut off the interruptible customers as soon as storage field gas was needed to maintain pressure in lines normally supplied only with gas from production fields. The storage withdrawal policy has no necessary relationship to the only express condition limiting service to GW: the preservation of service to higher priority customers. We cannot presume that the parties intended to add such an important condition by implication or by silence. *See* 3 *Corbin on Contracts* § 592 at 554–55 (1960).

In *Kansas Nebraska Natural Gas Co. v. Consumers Public Power District,* 179 Neb. 687, 140 N.W.2d 10 (1966), a gas sales contract called for interruptible service up to "the amount of gas [seller] has available after meeting peak load or other priority

---

9. We do not imply that we necessarily would consider KN's oral notice in interpreting the contract were we to find the contract ambiguous. Although extrinsic evidence is admissible to explain the meaning of an ambiguous agreement, extrinsic evidence may not be used to demonstrate an intent that contradicts or adds to the intent expressed in the writing. *Hayutin*

*v. Colorado State Dept. of Highways,* 175 Colo. 83, 86–87, 485 P.2d 896, 898, *cert. denied* 404 U.S. 991, 92 S.Ct. 533, 30 L.Ed.2d 542 (1971); *Regan v. Customcraft Homes, Inc.,* 170 Colo. 562, 565, 463 P.2d 463, 464 (1970); 4 S. Williston, *A Treatise on the Law of Contracts* § 629 (W. Jeager 2d ed. 1961).

demands of its customers...." The seller attempted to limit delivery under the contract to gas obtained from sources of supply already in existence at the time the contract was executed. The court held that the limitation could not be reconciled with the express condition on service contained in the contract; to the contrary, the court found that new sources of supply were included in the language requiring delivery of all gas available after higher priority demands had been met. Similarly, in the instant case, the contract included delivery from all sources until delivery to interruptible customers imperiled service to higher priority customers.

■■■ Because the contractual provisions governing KN's delivery obligations are not ambiguous, KN's oral expressions of intent (the alleged oral notification of KN's new interruption of service policy) are not material to the determination of the issue of contractual liability on summary judgment. *See Consumers Public Power District*, 140 N.W.2d at 14 (parol evidence may not be received where provisions governing interruptible gas service are unambiguous). Thus, the district court correctly concluded that all interruptions predicated upon withdrawal from storage, rather than upon an inability to serve higher priority customers, were in breach of contract. The district court's entry of summary judgment on the issue of direct contractual liability and its finding of breach under the service agreement were proper.

B. *Course of Dealing and Course of Performance*

In granting summary judgment, the district court also found that the parties' course of dealing from 1955 to 1973 was consistent with and buttressed the express terms of the agreement because under the historical twenty-four to thirty-six hour analysis KN interrupted service only when delivery to higher priority customers was imperiled. KN asserts that the parties'

course of conduct prior to 1973 is irrelevant to the interpretation of the 1973 contracts. By 1973, KN contends, conditions in the natural gas industry had changed radically; a national gas shortage had arisen, and the Commission had issued a number of orders requesting that pipeline companies conserve natural gas. Only the parties' course of performance under the 1973 contracts, KN maintains, is a true indication of their intent under such changed conditions. KN concludes that the district court should have interpreted the contract terms in light of KN's implementation of, and GW's acquiescence in, the new storage withdrawal interruption policy after 1973.

■■■ Under the provisions of the Uniform Commercial Code as adopted in Colorado,[10] the parties' course of dealing prior to execution of the contract always may be considered in interpreting the express terms of the contract in order that the true understanding of the parties to the agreement may be determined, whether or not the express terms of the agreement are found to be ambiguous. § 4-2-202(a), official comment 1(c), 2 C.R.S. (1973); *Amerine National Corp. v. Denver Feed Co.*, 493 F.2d 1275, 1278 (10th Cir.1974). Prior dealings are relevant and are generally the "best possible guide" to the parties' true intent. *Nahring v. City and County of Denver*, 174 Colo. 548, 552, 484 P.2d 1235, 1238 (1971) (quoting *Thompson v. Sweet*, 91 Colo. 552, 17 P.2d 308 (1932)). Therefore, the intent evidenced by such conduct is presumed to have been incorporated into the written contract unless the intent evidenced by the conduct has been "carefully negated" by the written terms. § 4-2-202, official comment 2. In the present case, the district court was justified in considering the intent manifested by the parties' eighteen year course of dealing under the twenty-four to thirty-six hour historical analysis.

---

10. A contract for the delivery of natural gas is a sale of goods within the meaning of Article 2 of the U.C.C., § 4-2-101 *et seq.*, 2 C.R.S. (1973).

*See Oskey Gasoline and Oil Co. v. OKC Refining,* 364 F.Supp. 1137, 1141 n. 2 (D.Minn.1973).

■■■ The parties' course of performance following execution of the contract is also relevant to the interpretation of the agreement. § 4–2–202(a). Course of performance may be used as an aid to interpretation whenever one party accepts repeated performance by the other party with knowledge of the nature of that performance and an opportunity to object to it. § 4–2–208, 2 C.R.S. (1973). Even assuming that these conditions were met here,[11] and that the parties' post-1973 course of performance could be considered, the district court's interpretation of the agreements at issue remains proper. Although a court must strive to harmonize the express terms of an agreement with the subsequent course of performance under that agreement, the express terms control where harmony cannot be found. § 4–2–208(2); *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 136 (5th Cir.), *cert. denied* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979). The court's goal is to give effect to the parties' intention as of the time the contract was made, Williston § 607 at 379; therefore, a course of performance may explain but not contradict the express terms of the writing. The parties' post-1973 course of performance cannot alter the intent expressed in the contract here.

■■■ Here, moreover, KN drafted the 1973 contract without materially changing the provisions governing interruption of service, despite the fact that KN was aware at the time both of the meaning with which the contractual provisions had been invested by an eighteen year course of dealing, and of the changed circumstances that purportedly necessitated abandonment of that course of dealing. KN's failure to alter the contract language in 1973 renders doubtful its assertion that it intended to change the meaning of the contractual language. *See Oskey Gasoline and Oil Co. v. OKC Refining*, 364 F.Supp. 1137, 1142 (D.Minn.1973) (where party that wishes to change course of dealing drafts a new written contract, it must demonstrate intent to do so by changing contractual language).

Under these circumstances, KN's post-1973 course of performance is a unilateral breach of contractual terms rather than an expression of the parties' mutual intent at the time the contract was made.

We hold that the district court properly enforced the express terms of the contract in light of the parties' course of dealing and course of performance.

**C. The Effect of Commission Orders, Tariffs and Certificates**

KN next argues that certain Commission orders, as well as certain of KN's tariffs and certificates of public convenience and necessity on file with the Commission, modified the contractual provisions concerning interruption of service, both by operation of law and by operation of the contractual provision incorporating administrative orders and regulations into the contracts. We examine the effect of certificates, orders and tariffs separately.

**1. Certificates of Public Convenience and Necessity**

Under section 7 of the Natural Gas Act, no pipeline company may transport natural gas or construct natural gas facilities unless the Commission first issues a certificate of public convenience and necessity. 15 U.S.C. § 717f(c) (1984 Supp.). Commission regulations provide that, once such a certificate has been issued, it remains effective "only so long as the applicant continues the operations authorized by the order issuing such certificate...." 18 C.F.R. 157.20(e) (1984). KN argues that the conditions attached to its certificates in the issuing orders required the adoption of the storage withdrawal interruption policy, and that the conditions superseded its contractual obligations both by operation of law and by the contractual language incorporating into the agreement all applicable "orders, rules and regulations" of authorities having jurisdiction over KN's operations. We need not decide whether certificate conditions supersede the contractual obligations in this case, because we determine that none of the certificate conditions

---

**11.** As noted above, GW denies knowledge of KN's institution of its new interruption policy.

to which KN points are inconsistent with KN's contractual delivery obligations.

■ KN first notes that the order permitting it to establish pipeline service to GW's plant at Ovid forbids KN from inaugurating firm service to any customer then served on an interruptible basis. 12 F.P.C. 505, 510 (1953). The condition in the order is consistent with a contract that prevents KN from implementing its storage withdrawal interruption policy; the dispute in this case focuses not on whether the contract permits interruptible service, but rather on the manner in which interruptions are to be implemented.

■ KN also relies on the certificate conditions for its service to Northern at Goodland, Kansas. The order granting the certificate incorporated by reference the conditions contained in KN's application for the certificate. 44 F.P.C. 218, 220 (1970). The application incorporated a rate schedule for interruptible gas, which provided that "service rendered under ·this rate schedule shall be subject to curtailment or interruption upon notice given by Seller to Buyer at least four hours in advance of its effective hour. . . ." Like the condition attached to the Ovid certificate, this condition specifies only that service may be interruptible; it does not address the manner in which interruptions are to be determined.

■ Finally, KN relies heavily on the order granting the certificate for its Big Springs storage field. KN directs our attention to the Commission's recognition in the order that "KN does not withdraw gas from underground storage to serve interruptible industrial customers." 55 F.P.C. 1956, 1958 (1976). This statement, however, merely recognized KN's unilaterally-imposed policy and was not made a condition to the issuance of the Big Springs certificate. Rather, the Commission made the statement while considering a petition to intervene filed by one of KN's customers, who contended that the establishment of a new storage field was incompatible with KN's previously filed application for permission to abandon service to that cus-

tomer. The Commission severed the issue from the certificate proceeding and redocketed it for consideration in subsequent abandonment and curtailment hearings. The Commission consolidated in the same hearings its consideration of the lawfulness of KN's newly-filed curtailment plan. 55 F.P.C. at 1959. The curtailment plan included KN's storage withdrawal interruption policy. (*See* discussion of Docket No. RP76-90 in Part I.C. 3, *infra*). Because the Commission explicitly postponed consideration of the lawfulness of KN's storage policy, its recognition of the policy earlier in the same order cannot be construed as approval of the policy.

### 2. *Commission Orders*

■ The Commission has jurisdiction to regulate "the transportation of natural gas in interstate commerce. . . ." 15 U.S.C. § 717(b) (1976). Its grant of jurisdiction empowers the Commission to issue orders requiring pipelines to design plans for the curtailment of natural gas delivery during times of shortage. *FPC v. Louisiana Power and Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). The Commission has exercised this power on a number of occasions.

Responding to a growing shortage of natural gas in the early 1970's, the Commission issued Order No. 431, designated a "statement of general policy." 45 F.P.C. 570 (1971). The order stated that pipeline companies "should make every reasonable effort to fill all storage fields ... to a capacity sufficient to meet the anticipated heating season demands." 45 F.P.C. at 571. The order further required that, where curtailment of deliveries would be necessary in order to carry out this policy, the pipeline affected should file a tariff sheet setting forth a curtailment plan. 45 F.P.C. at 572. The order concluded, "Such tariffs, *if approved by the Commission,* will control in all respects notwithstanding inconsistent provisions in sales contracts. . . ." *Id.* (emphasis added).

Two years later, the Commission responded to the continuing natural gas

shortage with Orders Nos. 467, 49 F.P.C. 85 (1973), and 467–B, 49 F.P.C. 583 (1973), which suggested an order of priority for the curtailment of natural gas during periods of shortage. These orders too were designated as policy statements and were "not intended to initiate a proceeding or to provide a binding rule without further proceedings directed towards curtailment problems on specific pipelines." 49 F.P.C. at 583. In subsequent curtailment proceedings, the Commission noted, individual curtailment plans would be judged according to the specific circumstances of the pipeline involved. 49 F.P.C. at 584–85. Later in 1973, the Commission issued Order No. 498, which requested that pipelines "husband present supplies of natural gas for high priority usage," and suggested a number of steps that might be taken to conserve supplies of natural gas. 50 F.P.C. 1954, 1957 (1973). None of the suggested conservation measures related to curtailment of deliveries. *Id.*

KN contends that this series of orders required implementation of its storage withdrawal interruption policy and superseded any contractual obligations to the contrary. KN notes that every order issuing a certificate of public convenience and necessity, as well as a Commission regulation, 18 C.F.R. § 157.20(e), condition the continued validity of KN's certificates upon compliance with all applicable Commission orders, rules and regulations. KN also argues that this series of orders was incorporated into the contract by reference. We disagree.

■ Although Order No. 431 permits curtailment plans aimed at preserving supplies of natural gas in storage to supersede contractual provisions to the contrary, the order provides that such plans may supersede contractual provisions only "if approved by the Commission...." Approval may be granted only through proceedings under sections 4 or 5 of the Natural Gas Act, 15 U.S.C. §§ 717c and 717d (1976), to determine whether the plans are just, reasonable, and nondiscriminatory. *Louisiana Power and Light,* 406 U.S. at 642–47,

92 S.Ct. at 1839–41. *Hercules, Inc. v. FPC,* 552 F.2d 74, 76–77 (3d Cir.1977); *State of Louisiana v. FPC,* 503 F.2d 844, 867 (5th Cir.1974); *American Smelting and Refining Co. v. FPC,* 494 F.2d 925, 934–35 (D.C.Cir.), *cert. denied* 419 U.S. 882, 95 S.Ct. 149, 42 L.Ed.2d 122 (1974). Thus, the order has no binding effect by itself and is a policy statement that does not mandate or approve KN's storage withdrawal interruption policy or any other particular curtailment plan. *Hercules,* 552 F.2d at 77.

■ Orders Nos. 467 and 467(b) similarly are policy statements rather than mandatory orders. *General Motors Corp. v. FERC,* 613 F.2d 939, 945 (D.C.Cir.1979); *Hercules,* 552 F.2d at 77; *Pacific Lighting Service Co. v. FPC,* 518 F.2d 718, 719 (9th Cir.), *cert. denied* 423 U.S. 1000, 96 S.Ct. 432, 46 L.Ed.2d 376 (1975); *Pacific Gas and Electric Co. v. FPC,* 506 F.2d 33 (D.C. Cir.1974). Like Order No. 431, these orders envision further proceedings for the approval or rejection of individual curtailment plans. Thus, "[a]ny abrogation of contractual commitments will occur only after individual curtailment plans have been filed and approved by the Commission." *Pacific Gas and Electric Co.,* 506 F.2d at 42.

Order No. 498 is a nonmandatory policy statement as well. It "requests" that gas be husbanded in storage for high priority use, but it does not specify particular curtailment measures. Like the other orders, Order No. 498 has no effect by itself on KN's contractual delivery commitment. Under all of the orders cited by KN, its contract obligations can be altered, if at all, only after individual curtailment plans have been approved. We therefore turn next to the curtailment plans filed by KN.

### 3. *KN's Tariffs*

Pipeline companies subject to Commission jurisdiction are required to submit to the Commission a tariff sheet showing rates charged for the transportation or sale of natural gas, along with the "classifications, practices, and regulations affecting such rates and charges...." 15 U.S.C.

§ 717c(c) (1976). The tariff becomes effective automatically thirty days after filing. 15 U.S.C. § 717c(d). However, the Commission, upon complaint or upon its own motion, may suspend the operation of the tariff for five months while it conducts a hearing to determine whether the provisions of the tariff are just, reasonable and nondiscriminatory. 15 U.S.C. § 717c(d). At the close of the five month period, the tariff becomes effective whether or not the Commission has made its determination. *Id.* Once a tariff has become effective, the Commission may find it unlawful retroactively. *Id.* In addition, at any time after a tariff becomes effective, the Commission may initiate proceedings to determine its lawfulness. 15 U.S.C. § 717d (1976).

On August 29, 1975, KN filed a tariff sheet that contained a curtailment plan incorporating the clause: "Seller shall not be required to remove gas from storage reservoirs for delivery to consumers served by Seller on an interruptible basis or under interruptible service rates schedules in this Tariff." The tariff filing was suspended for the statutory period of five months and became effective on March 14, 1976, while a hearing into its lawfulness was pending in Docket No. RP76–90. On June 25, 1976, GW was permitted to intervene. On December 27, 1976, KN filed a revised tariff in RP76–90 setting forth eight priority-of-service categories. The revised tariff retained the provision governing removal of gas from storage, but substituted the phrase "consumers in step one through step five" for the phrase "consumers served by seller on an interruptible basis." All of GW's interruptible fuel service fell within steps one through five. After a first round of hearings, the revised tariff was permitted to become effective pending a final determination of its lawfulness.

In an initial decision in the second round of hearings on the tariff's lawfulness, a Commission Administrative Law Judge (ALJ) held that the tariff provision permitting interruption of service in order to preserve storage violated section 4 of the Natural Gas Act because the curtailment of service to existing customers in order to permit increased service to new or existing customers was unjust, unreasonable, and unduly discriminatory. 6 F.E.R.C. ¶ 63,055 (1979). The ALJ also held that such interruptions constituted an abandonment, in circumvention of the requirements of section 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b). On November 2, 1981, the Commission approved a settlement terminating the proceeding in Docket No. RP76–90. 17 F.E.R.C. ¶ 61,102 (1981). The agreement included the following provision:

> Seller shall not be required to remove gas from gas storage reservoirs for delivery to consumers in priority five served by Seller or Buyer, but may utilize gas in storage to make such deliveries when, by reason of storage inventories and prospective withdrawals the withdrawals of gas from storage will not, in the sole judgment of Seller, impair its ability to supply the requirements of consumers, classified in priority one, priority two, priority three, and priority four, during the succeeding twelve month period.

Under the agreement priority five included the same categories of customers included in the earlier steps one through five of the 1976 tariff. The Commission found the settlement provision to be just and reasonable under section 4 of the Natural Gas Act, but refrained from passing on the lawfulness of the provisions contained in the earlier 1975 and 1976 tariffs.

The effect of the tariff filings on the contractual provisions at issue is governed by the United States Supreme Court decisions in *United Gas Pipeline Co. v. Mobile Gas Service Co.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), and *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). In *Mobile*, a pipeline company filed a tariff containing a rate schedule different than the rate schedule contained in its existing service contract. The Commission permitted the tariff to become effective after thirty days under section 4(d) of the Natural Gas Act. 15 U.S.C. § 717c(d). The Court held that the

filing did not permit the pipeline company to abrogate its contractual obligations. According to the Court, "the Act expressly recognizes that rates to particular customers may be set by individual contracts." 350 U.S. at 338. Section 4(d) does not sanction unilateral changes in contracts; rather, it merely provides that the Commission be notified of contractual changes through tariff filings in order to facilitate subsequent Commission supervision of these contracts. *Id.* 350 U.S. at 339, 76 S.Ct. at 378. A tariff filing, the Court found, is the unilateral act of the natural gas company and does not become the order or act of the Commission, even though it becomes automatically effective. *Id.* at 342, 76 S.Ct. at 379. Such unilateral action, the Court concluded, is legally ineffective:

> Absent the Act, a unilateral announcement of a change to a contract would of course be a nullity, and we find no basis in the language of section 4(d) for inferring that the mere imposition of a filing-and-notice requirement was intended to make effective action which would otherwise be of no effect at all.

*Id.* at 339, 76 S.Ct. at 378.

In *Sierra*, the Court reached the same conclusion concerning "substantially identical" provisions of the Federal Power Act. 350 U.S. at 350–52, 76 S.Ct. at 369–371. The Court further held that the unilateral rate changes did not supersede inconsistent contractual terms even though the Commission specifically found the tariff lawful after hearings. *Id.* at 352–53, 76 S.Ct. at 371. Rates that abrogate existing contracts may only be found lawful, the Court held, if the Commission first finds that the existing contractual rate is unjust, unreasonable, discriminatory or preferential. *Id.* at 353–55, 76 S.Ct. at 371–72.

 We believe that the *Mobile-Sierra* rule applies to tariff provisions, other than rate schedules, that have not received Commission approval. Like rate schedules, curtailment plans contained in tariff filings are not lawful merely because they become effective after passage of the statutory period; the legality of the plans remains an open question until the Commission conducts hearings and issues a determination under either section 4 or section 5 of the Natural Gas Act. *Hercules*, 552 F.2d at 87. At least initially, the plans are unilateral actions on the part of the natural gas company and a legal nullity. *Mobile*, 350 U.S. at 339, 76 S.Ct. at 378. Moreover, the Court in *Mobile* found that its conclusion was justified by the Natural Gas Act's purpose of "preserving the integrity of contracts...." 350 U.S. at 344, 76 S.Ct. at 380. "The basic thrust of *Mobile* is that the NGA did not displace but only superimposed federal regulation on private contractual arrangements." *Pennzoil Co. v. FERC*, 645 F.2d 360, 373 (5th Cir.1981), *cert. denied* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). The stability and integrity of contractual terms governing delivery conditions are as worthy of protection as contractual rate schedules under the *Mobile-Sierra* rule. Therefore, a natural gas company may not unilaterally change the contractual provisions governing interruptible delivery merely by filing a tariff.[12]

 In the present case, the 1975 and 1976 storage withdrawal provisions were never judged lawful by the Commission. While the Commission found the interruption provision contained in the 1981 settlement agreement to be just and reasonable, it explicitly refrained from a similar finding regarding the earlier tariffs under which KN was operating throughout the period for which GW sought damages. The tariff provisions remained the unilateral action of KN. Although the contract explicitly incorporated the "orders, rules and regula-

---

12. The effect of Commission approval of a tariff filing containing a curtailment plan on an existing contract is not before us. We note that it is an open question whether the Commission may approve a curtailment plan that abrogates contractual delivery commitments without first finding, as required by *Sierra*, that the contractual terms adversely affect the public interest. One court has indicated in *dicta* that the *Sierra* requirement must be met. *International Paper Co. v. FPC*, 476 F.2d 121, 127–28 (5th Cir.1973).

tions of duly constituted authorities having jurisdiction or control over the parties ...," under the reasoning of *Mobile*, the tariff filing never became an "order" of the Commission, *Louisiana Power and Light Co. v. FERC*, 587 F.2d 671, 676 (5th Cir.1979), and the tariff did not affect the contract.[13]

Moreover, quite apart from its legal status, the tariff filing had no effect on the contractual terms because the filing was not inconsistent with the terms of the contract. The filing merely stated that KN was not required to withdraw gas from storage in order to serve its interruptible or lower priority customers. The tariff, however, did not forbid KN from withdrawing storage gas for use by interruptible customers. Under the tariff, KN retained the freedom to make any agreement it wished concerning withdrawal of gas from storage. By entering into a contract with GW that did not permit it to withhold storage gas from GW, KN acted in a manner consistent with the tariff provision.

We conclude that nothing in KN's certificates or tariffs, or in the Commission's relevant orders, superseded or modified the unambiguous terms of KN's contract with GW.

## II. EVIDENTIARY RULINGS

### A. *Exclusion of Certificates, Orders and Tariffs*

■ At trial, the court excluded from evidence as irrelevant Commission orders concerning curtailment, the certificates of public convenience and necessity governing KN's storage and pipeline operations, and the 1975 and 1976 KN tariff sheets. Rulings on the relevancy of proffered evidence

are within the sound discretion of the trial court and will not be disturbed on review absent an abuse of discretion. *People v. Lowe*, 660 P.2d 1261, 1264 (Colo.1983); *Publix Cab Co. v. Colorado National Bank*, 139 Colo. 205, 232, 338 P.2d 702, 716 (1959). In addition, evidentiary rulings may constitute reversible error only when they affect a "substantial right" of the objecting party. C.R.E. 103(a).

■ KN argues that the proffered exhibits were relevant to the issue of damages and that their exclusion deprived it of a fair trial on damages. In support of its contention, KN again argues that the documents replaced the contractual standard for interruption with a binding governmental standard. This issue was resolved, however, when the trial court granted partial summary judgment in favor of GW on the issue of liability based on the contractual standard for interruption. Therefore, the only facts material to the determination of damages were whether interruptions had occurred, and whether such interruptions resulted from the application of an interruption standard that was in breach of the contractual standard. KN's exhibits, offered for the purpose of reinterpreting the contract, were not addressed to any of these material facts, and their exclusion was proper. C.R.E. 401.

### B. *Exclusion of Expert Testimony*

KN also challenges the exclusion of certain portions of its expert witness' testimony. KN called W.R. Chaney, a consulting engineer, to testify to his conclusion that a number of the interruptions sustained by GW were caused by KN's physical inability

---

**13.** Even had the tariff been considered by the Commission, the United States Supreme Court has held that "the existence of an actual shortage of gas forms the factual predicate necessary to the Commission's assertion of authority under its transportation jurisdiction, § 1(b) of the Act, 15 U.S.C. § 717(b), to approve the curtailment of gas already contracted for." *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976). In the first phase of Docket No. RP76–90, the Commission found that KN's tariffs contained a curtailment plan and should be judged

by the criteria applicable to such plans. 58 F.P.C. 2890, 2898 (1977). KN never asserted that it suffered from a shortage of gas. KN's curtailment plan did not require that a shortage arise before the storage policy would go into effect. During both the first and second phases of the proceedings in Docket No. RP76–90, the ALJ found that KN was not suffering from a shortage of natural gas, and did not expect a shortage, if at all, for years to come. The necessary factual predicate for approval of a curtailment plan for gas already subject to contract was lacking in RP76–90.

to deliver gas and would have occurred even under the historical twenty-four to thirty-six hour analysis. In support of this conclusion, Chaney first discussed what he termed the "nominal throughput" analysis. Under his analysis, Chaney projected the amount of gas KN had available for delivery over the long term, and compared this amount to the natural gas requirements of all of KN's customers. The court excluded the testimony, ruling that physical inability to deliver gas could be demonstrated only by application of the short term twenty-four to thirty-six hour projections required by the contract. We agree with the court's ruling.

The contract contemplated application of a short term analysis to determine pipeline capacity each day. Conclusions based upon a long term analysis could not demonstrate that any interruption was not in breach of contract. The district court properly excluded the expert's conclusions as irrelevant.

Chaney then presented a number of short term analyses in an attempt to comply with the court's ruling. First, Chaney examined KN's daily records for the period in question to compare the amount of gas available in KN's production and storage fields against the amount of gas actually sold on a given day. Where more gas was available than was sold, Chaney hypothetically withdrew gas from storage in order to satisfy any interruptions that occurred on those days. Chaney estimated that as the amount of gas available from storage was depleted over time, there would have been sixty-one days in which KN would have been physically unable to serve its interruptible customers from storage. The court ruled the testimony inadmissible because Chaney's analysis did not distinguish among interruptible customers in determining whether gas would have been available to GW on any given day; this analysis was contrary to undisputed evidence that KN interrupted its power plant customers before it interrupted GW.

Chaney then performed the same analysis again, this time including an assumption that the power plant customers were interrupted before GW was interrupted. Chaney concluded that there were fourteen days on which delivery to KN would have been physically impossible. GW counsel objected on the ground that the analysis was contrary to evidence that gas could have been injected into storage throughout the period, and that Chaney's assumption of storage depletion was incorrect. The court sustained the objection.

Chaney next attempted to apply a twenty-four to thirty-six hour analysis as required by the contract, but did so by assuming certain hypothetical weather conditions. The court ruled that this testimony was inadmissible because it was contrary to earlier testimony that dispatchers relied upon actual and not hypothetical weather conditions in applying the twenty-four to thirty-six hour analysis. Chaney then applied the twenty-four to thirty-six hour analysis on the basis of actual weather conditions; his testimony again was excluded on the ground that his analysis did not distinguish among classes of interruptible customers.

The district court rulings were correct. Although expert testimony need not be based upon facts admissible in evidence, the facts relied upon must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." C.R.E. 703. Facts that are contrary to the undisputed evidence cannot be reasonably relied upon by experts. *See High v. Industrial Commission*, 638 P.2d 818, 820 (Colo.App.1981) (expert opinion based on facts contrary to the evidence "has no evidential efficacy"); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977) (stating in dicta that, under identical federal rule, expert testimony may not be based upon unsupported assumptions); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 505 F.Supp. 1313, 1330 (E.D.Pa.1980) (under identical federal rule, court may consider whether facts relied upon by expert are

supported by the evidence). Expert opinions, whether or not based on evidence admitted at trial, are admissible only when they "will assist the trier of fact to understand the evidence or to determine a fact in issue...." C.R.E. 702. An expert opinion based on facts contrary to the evidence cannot be helpful in understanding the evidence.[14] Here, the district court correctly predicated its evidentiary rulings on this principle.

Following these rulings, KN offered to prove through Chaney that delivery of gas to GW would have been physically impossible on certain days based upon a twenty-four to thirty-six hour projection, taking into account actual weather conditions and the actual priorities of interruption followed by KN. The trial court refused to receive the evidence because the facts underlying this "actual conditions" analysis had not been made available to GW in a timely fashion.

The record reveals a history of KN's incomplete and untimely compliance with discovery procedures. On September 28, 1978, GW submitted an interrogatory asking that KN identify its expected expert witnesses, the substance of their testimony, and the facts upon which their opinions would be based. On October 30, 1978, KN refused to answer the interrogatory because it was "premature." On April 27, 1979, KN supplemented its answer by identifying W.R. Chaney as an expert witness and stating that Chaney was expected to testify to KN's physical inability to deliver gas under both hypothetical and actual weather conditions during the period in issue. The answer further stated that Chaney's opinion was to be based upon a review of KN's daily records. At his deposition on June 5–7, 1979, Chaney testified that he had begun working for KN in October 1978 and that he had selected his analyses in December 1978 or January 1979. He also set forth the conclusions he had

reached under many of the analyses set forth above, but he made no mention of the final "actual conditions" analysis ultimately excluded at trial. At Chaney's deposition, KN counsel promised to supply GW with copies of all the work papers upon which Chaney had relied in reaching his conclusions.

On June 18, 1979, when the work papers still had not been provided, the district court ruled that KN had failed to fulfill its discovery obligations under C.R. C.P. 26 because KN had failed to name Chaney as an expert witness in its first interrogatory response, had failed to reveal his identity and analysis in a timely supplementary answer, and had failed when that supplementary answer was finally given to set forth the specific conclusions Chaney had reached and the specific facts he had relied upon. After KN's counsel once again promised to supply Chaney's work papers, the court set June 21 for a renewed deposition of Chaney. At the June 21 deposition, Chaney disclosed that he had performed an interruption analysis based upon the contract standard under actual conditions, but was unable to reveal the conclusions he drew from his "actual conditions" analysis. The conclusions, he stated, were in his work papers in Kansas City. These papers, along with many others, were given to GW for the first time in the days following the June 21 deposition, some arriving as late as July 2, the opening day of trial. On July 2, the court ruled that it would not receive any testimony based upon work papers received by GW after June 21, and, on this basis, excluded Chaney's "actual conditions" analysis.

The district court's imposition of the sanction excluding evidence was an appropriate exercise of its discretion. Under C.R.C.P. 26(b)(4)(A)(i), a party may discover through interrogatories the identity of all proposed expert witnesses, the subject mat-

14. The former rule in Colorado was that "an opinion by an expert cannot be based on facts not in evidence." *Liber v. Flor,* 160 Colo. 7, 16, 415 P.2d 332, 337 (1966). Under C.R.E. 703, the facts upon which an expert relies need no long-er be admissible in evidence, but the rule of *Liber* retains its vitality to the extent that it forbids reliance upon facts contrary to the stated evidence.

ter upon which they will testify, the substance of the facts and opinions to be contained in their expected testimony, and a summary of the grounds for their opinions. KN's failure to identify Chaney as a possible expert witness in its first interrogatory response violated the rule. In addition, C.R.C.P. 26(e)(1)(B) requires that all responses to interrogatories concerning expert witnesses be seasonably supplemented. KN failed to identify any of Chaney's analyses until April 1979, months after he had been hired and his analyses chosen, and failed to identify at any point prior to Chaney's first deposition the exact conclusions and facts he relied upon in his analyses. KN's violation of the rule was compounded by its failure to identify Chaney's "actual conditions" analysis until June 21, and its accompanying failure to supply the relevant work papers until a few days before trial.

■ When Rule 26 is flouted, the trial court has the inherent discretion to levy appropriate sanctions. *Murphy v. Magnolia Electric Power Ass'n*, 639 F.2d 232, 234 (5th Cir.1981); *Phil Crowley Steel Corp. v. Macomber, Inc.*, 601 F.2d 342, 344 (8th Cir.1979); *Holiday Inns, Inc. v. Robertshaw Controls Co.*, 560 F.2d 856, 857 (7th Cir.1977); *Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96, 99 (3d Cir.1977); *Davis v. Marathon Oil Co.*, 528 F.2d 395, 404 (6th Cir.1975), *cert. denied* 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976); *Price v. Lake Sales Supply R.M., Inc.*, 510 F.2d 388, 395 (10th Cir.1974); *Lewis v. Darce Towing, Inc.*, 94 F.R.D. 262, 25–66 (W.D. La.1982); *Tabatchnick v. G.D. Searle and Co.*, 67 F.R.D. 49, 55 (D.N.J.1975); *White v. Citizens National Bank of Boone*, 262 N.W.2d 812, 816 (Iowa 1978); *see also Wood v. Rowland*, 41 Colo.App. 498, 592 P.2d 1332 (1978) (court may levy sanctions for failure to disclose expert testimony in accordance with local court rules). In determining whether sanctions were appropriate in the cited cases, the courts considered some or all of the following factors: the extent of prejudice to the opposing party from nondisclosure, whether the prejudice could be cured, the importance of the evidence to the nondisclosing party, whether the nondisclosing party had a valid excuse for failure to disclose in a timely fashion, whether nondisclosure violated an existing court order, and whether nondisclosure would adversely affect the trial process. *Id.* The courts are split over whether the bad faith of the nondisclosing party may be considered. *Compare, e.g., Dudley*, 555 F.2d at 99 *with White*, 262 N.W.2d at 816.

We need not decide whether bad faith should be considered in determining the appropriate sanction because application of all of the other factors overwhelmingly supports the exercise of the district court's discretion in imposing sanctions here. KN's failure to supply work papers until after the June 21 deposition prejudiced GW by depriving it of an opportunity to examine Chaney concerning the basis for his opinion prior to trial. Because the work papers were not received until just prior to trial, there was no opportunity for GW to cure the prejudice. Although the district court did not specifically order that the work papers be supplied, it ordered the June 21 deposition on the understanding that KN would supply the supporting documentation. Thus, KN's actions defied an understanding with the court, if not a direct order. KN presented no excuse for its failure to supply the papers over the many months it had to do so. Moreover, a failure to exclude evidence based upon the undisclosed work papers would have adversely affected the trial process by requiring a continuation to compensate for GW's missed preparation. Although the excluded evidence was undoubtedly of some importance to KN, the sanction of exclusion was well within the trial court's discretion in light of KN's repeated failure to respect the discovery process.

The judgment of the Court of Appeals is affirmed.