**ENGINEERED DATA PRODUCTS, INC.,
a Michigan corporation, Plaintiff,**

v.

**NOVA OFFICE FURNITURE, INC., a Pennsylvania corporation, and Nova Manufacturing & Assembly, Inc., an Illinois corporation, Defendants.**

Civ. A. No. 90–B–2262.

United States District Court,
D. Colorado.

April 27, 1994.

Joseph A. Davies, Scott M. Tarbox, Rumler Davies, P.C., Denver, CO, for plaintiff.

Joseph E. Meyer III, Pendleton & Sabian, P.C., Denver, CO, William W. Austin, Parker, Siemer, Austin & Resch, Effingham, IL, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BABCOCK, District Judge.

The claims in this case were bifurcated for trial. Plaintiff Engineered Data Products, Inc's (EDP) fourth claim seeks declaratory judgment as to the parties' relationship under their license and marketing agreement. Jurisdiction rests upon 28 U.S.C. §§ 1332, 1441, and 2201. Pursuant to Fed.R.Civ.P. 52, at the close of the trial, I entered upon the record findings of fact and conclusions of law. I also ordered the parties to submit an agreed form of judgment definitively declaring their relative rights and duties under the disputed provisions of the agreement. Unable to agree as to the form of judgment, they each submitted a form of judgment and briefed the disputed issues.

An actual controversy exists between the parties which presents a substantial question as to their rights, status and legal relationship under the license and marketing agreement. Pursuant to 28 U.S.C. § 2201 and Fed.R.Civ.P. 57, I enter this declaratory judgment in accordance with the findings of fact and conclusions of law entered on the record on December 2, 1993. While this order is intended to be consistent with the findings and conclusions entered on the record, if any inconsistencies exist, this order controls.

## I. FINDINGS OF FACT

EDP is a Michigan corporation principally based in Broomfield, Colorado. Nova Office Furniture, Inc. (Nova Office) is a Pennsylvania corporation and Nova Manufacturing & Assembly, Inc. (Nova Mfg.) is an Illinois corporation. Both Nova Office and Nova Mfg. (collectively Nova) conduct business from their principal offices in Effingham, Illinois.

EDP manufactures primarily metal fabricated computer accessories and furniture. In 1987, Mr. Schairbaum (Schairbaum), owner of patent No. 4,590,866 (866 patent or Schairbaum invention), contacted EDP about licensing his patent to EDP so that it could manufacture "network desks". The network desk concept refers to a work station designed to utilize a work surface with a transparent portion under which a computer monitor is located so as to be visible through the transparent portion. When approached with this idea, EDP had very little experience in manufacturing traditional office furniture nor did it have a distribution system to market traditional office furniture. In addition, EDP's primary medium for manufacture was metal, although it utilized some laminated wood type of work surfaces.

Schairbaum licensed the 866 patent to EDP. In the addendum to the license agreement with Schairbaum, there are provisions for Schairbaum's approval and input into certain sub-licensing situations. EDP began constructing an office furniture desk which practiced the Schairbaum invention. However, EDP found it was an undesirable product because its metal fabrication was not accepted in the traditional office environment. EDP then went to a rim-mold plastic form of product. That product was expensive and not well accepted into the office furniture market either. Then, on a limited basis, EDP constructed and marketed a wood desk practicing the Schairbaum invention. This product was also unsatisfactory because it was heavy and expensive.

EDP then began looking for a more economical and aesthetic wood product to practice the 866 patent in the office furniture market. At a trade show, Mack Johnson of EDP met Mr. Lechman (Lechman) and began discussing a business relationship with him. Lechman had some experience in wood cabinetry fabrication and a patent which facilitated fabrication of wood cabinetry.

Their discussions continued for some time. Lechman indicated that he could manufacture and distribute a wood product incorporating the 866 patent in the office furniture market. Indeed, he began doing so on a limited basis without any form of license or written agreement. However, EDP was concerned that Lechman had no demonstrated financial stability or history in the office furniture market.

When Lechman secured support of Mr. Stevens (Stevens) of Stevens Industries Inc., EDP's position changed. Stevens Industries, an Illinois corporation, was in the business of manufacturing wood and wood laminate components for institutional and office furniture. Stevens and Mr. Wegman (Wegman), also of Stevens Industries, became sources for capitalization of what later became Nova. Nova was created as a result of ongoing negotiations between EDP and Lechman, Stevens and Wegman, the individuals who later became its principals.

The contract at issue here was negotiated mainly by Mr. Phillips (Phillips) on EDP's behalf and Mr. Schnorf (Schnorf) for Nova. Phillips was a business consultant to EDP, a former practicing attorney and a business person. Schnorf was Stevens Industries' chief financial officer and secretary/treasurer.

During negotiations, EDP expressed its desire to retain as much control and exclusivity as possible over the intellectual property rights principally reflected by the 866 patent and as much control of the market as possible. Not surprisingly, Nova wanted to obtain as much of the Schairbaum technology and patent rights as possible and the greatest degree of exclusivity for its manufacturing and marketing role. Hence, the parties began at two opposite ends of the spectrum in this respect. However, through negotiation, there was give and take on both sides.

Separate contracts concerning the parties' marketing and license agreements were executed on February 28, 1990. However, the marketing and license agreements are integrated and constitute one contract to license

technology for a product which would be manufactured and marketed by Nova. Nova was structured to infuse the Stevens' group funds into Nova Mfg. which would fabricate and manufacture the wood desks while Nova Office would market and distribute this product.

In relevant part, the marketing agreement contains the following provisions. It contains a recital on page 1 which states:

> Whereas, EDP has licensed certain patents, inventions and trademarks to Nova Manufacturing & Assembly, Inc., from which Nova [Office] intends to purchase products for remarketing at wholesale.

Paragraph 1 appoints Nova Office as a distributor. In paragraph 2, the parties agree to mutually cooperate. Significantly, paragraph 4 provides that:

> During the term of this agreement neither party shall handle nor sell products in direct competition with the other, except as expressly permitted by this agreement or as contemplated by the license agreement of even date herewith between EDP and Nova Manufacturing & Assembly, Inc.

The license agreement includes the following relevant provisions. One recital states that "Whereas, the licensee manufactures plastic laminated wood office furniture and sells the same through its exclusive marketing representative, Nova Office Furniture, Inc." Another recital reads:

> Whereas, the licensee desires to obtain a sub-license as to the Schairbaum patents, a license as to the EDP inventions and a license as to the trademark, to practice and use the same together with the Lechman patent for the purpose of manufacturing, using and selling exclusively through the said Nova Office Furniture, Inc., office, commercial and institutional furniture, and other products which incorporate one or more aspects of the proprietary rights represented by the patents, inventions and trademark . . .

The license agreement, in addressing the non-exclusive grant in paragraph 1, states:

> *Non-exclusive grant.*
> (a) The licensor hereby grants to the licensee the non-exclusive right and license to practice the Schairbaum patents, together with all related foreign patents now owned or hereafter acquired, within the territory hereinafter defined; and,
> (b) The licensor hereby grants to the licensee the non-exclusive right and license to practice the EDP inventions, together with all related United States and foreign patents now owned or hereafter acquired, within the territory hereinafter defined; and,
> (c) The licensor hereby grants to the licensee the non-exclusive right and license to use the trademark within the territory hereinafter defined: to manufacture, use and market products which incorporate one or more aspects of the proprietary rights represented by the patents inventions and trademark.

Paragraph 2, entitled "Exclusive grant", provides:

> (a) The licensor hereby grants to the licensee the exclusive right and license to practice the patents, inventions and trademark to manufacture, use and market products, as defined below, which incorporate one or more aspects of the proprietary rights represented by the patents, inventions and trademark, but only within the territory and markets defined below. Notwithstanding the foregoing, the licensor reserves the right to the concurrent use of the trademark, the right to practice the patents and inventions to the extent necessary for it to continue to manufacture, use and market its current NS/2 product line, and the right to practice the patents and inventions with respect to any other product and in any other market or territory, except as may be limited by Paragraph 13.
> (b) The term "products" for purposes of this exclusive grant shall be limited to products primarily constructed of wood, laminated wood, or wood veneer.
> (c) The term "markets" for purposes of this exclusive grant shall be limited to the stand-alone office, commercial and institutional furniture markets.

Paragraph 5 concerning royalties reads:

> *Royalties.* During the term of this agreement the licensee shall pay to the licensor a royalty equal to the lesser of:

(a) Six percent of the net product price to the licensee's customer; or,

(b) $50;

for each product when sold by the licensee under the licenses granted herein.

Paragraph 13 grants a "Right of first refusal" stating:

(a) In the event the licensor develops a product for distribution in markets other than those defined in Paragraph 2, or is prepared to license a third party to do so, which incorporates one or more aspects of the proprietary rights represented by the patents and inventions which is primarily constructed of wood, laminated wood or wood veneer, or having a work surface constructed of any of the aforesaid materials, the licensor shall give the licensee by detailed written notice a description of the product and the right of first refusal to exclusively manufacture, use and market the product within the terms of Paragraph 2 of this agreement, within that additional market.

I note that the clause "or having a work surface constructed of any of the aforesaid materials" was expressly deleted from paragraph 2(b) of the "exclusive grant" at Phillips' request, but remained in paragraph 13(a) with the parties' mutual understanding and knowledge.

Paragraph 15 entitled "Binding Effect" provides:

This agreement shall be binding upon and shall inure to the benefit of each party and its respective successors in interest. The licensee is expressly permitted to enter into subcontracts in the exercise of the rights and licenses granted herein and to grant sub-licenses to third parties as to all or any of the proprietary rights represented by the patents, inventions and trademark. Notwithstanding the foregoing, no such sub-license shall relieve the licensee from its obligation to pay royalties to the licensor as determined in accordance with this agreement.

"Network desk" is defined as:

A work stations, such as a table or desk, having a horizontal work surface below which a CRT used at the work station in conjunction with a computer is suspended and adjustable in such a manner that it may be viewed through the work surface and by the user.

"Wood" refers to solid wood, laminated wood and wood veneer, unless otherwise qualified. The terms "products" and "markets" are defined in the agreement itself in paragraphs 2(b) and 2(c) respectively. In addition, by way of trial testimony, the parties defined the counterpart of the stand-alone market— "the systems market". The BIFMA product category definition, admitted as exhibit P, contains a section at page 3 for "systems furniture" and a specific sub-paragraph concerning work surfaces. This exhibit offers some guidance here even though it is a 1993 document. I infer that it contains the specific trade usage of the terms "systems furniture" and "stand-alone furniture" as of the date of the license agreement, February 28, 1990, because no evidence was presented to the contrary.

When the agreement was signed, EDP sold a rim-mold stand-alone plastic desk with a laminated wood top, the NS/2 product line, which was later dropped from EDP's catalog and price list. This same stand-alone product, but with a metal base, was later reintroduced as the Paralax line now being marketed as illustrated in the brochure exhibits. It has not been offered to Nova Mfg. under the right of first refusal provision in paragraph 13.

EDP now manufactures and markets retrofit kits. This product was not in existence when the agreement was executed. These kits are 95 percent metal with some plastic component and can be applied to convert metal desks with laminated wood tops and wood desks to "network desks". At this time, EDP has not been marketing the kits for desks made primarily of wood. The president of EDP, Mr. Price, indicated that some efforts were made to protect against the sale of these kits for use with wood desks. However, I find that those efforts or protections are nominal at best. The retrofit product has not been offered to Nova under the right of first refusal provision in paragraph 13.

Dispute concerning the parties' rights and duties under the license agreement brings us to this declaratory judgment phase of the

case. While the marketing agreement may have been more forcefully negotiated, I agree with Phillips that it is simply a "best efforts" type of arrangement. As a result, there is no controversy concerning the marketing agreement for me to resolve at this juncture. Accordingly, my ruling here addresses the provisions in the license agreement only.

## II. CONCLUSIONS OF LAW

I apply Colorado law to interpret and declare the respective rights and duties of the parties under their agreement. No one argues otherwise. There are settled legal principles that guide my interpretation of these disputed provisions.

The first thing to be ascertained is the intent of the parties as it existed at the time the contract was executed. *William B. Tanner Co., Inc. v. Mesa Broadcasting Co.,* 571 F.Supp. 28, 29 (D.Colo.1983); *In re Marriage of Piper,* 820 P.2d 1198, 1200 (Colo. App.1991). This intent is gleaned from the language of the agreement itself and extrinsic evidence is admissible only if there is ambiguity in agreement's terms. *Matter of May,* 756 P.2d 362, 369 (Colo.1988). Whether an ambiguity exists is a matter of law for the court to determine. *KN Energy, Inc. v. Great Western Sugar Co.,* 698 P.2d 769, 776 (Colo.1985). Ambiguity has been defined by Colorado courts as occurring when "a contract provision is reasonably and fairly susceptible of more than one meaning." *Geralanes B.V. v. City of Greenwood Village,* 583 F.Supp. 830, 838 (D.Colo.1984) (citing *Union Rural Elec. Ass'n, Inc. v. Public Utilities Com'n of State,* 661 P.2d 247, 251 (Colo. 1983)).

To determine whether ambiguity exists, I may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract. *Kn Energy,* 698 P.2d at 777. It is only where the terms of an agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the agreement to determine the parties' intended meaning. *Id.* at 776. However, the court may not consider the parties' own extrinsic expression of intent. *Id.*

Construction of a contract should be reasonable and not lead to an absurd result. *See Lowell Staats Min. Co., Inc. v. Pioneer Uravan, Inc.,* 596 F.Supp. 1428, 1430 (D.Colo.1984). Recitals and titles, not being strictly part of the contract, cannot extend contractual stipulations, though they may have material influence on the construction of the instrument and the determination of parties' intent. *Las Animas Consol. Canal Co. v. Hinderlider,* 100 Colo. 508, 68 P.2d 564, 566 (1937); *See generally Morath v. Perkins,* 86 Colo. 101, 278 P. 611, 612–613 (1929). All of the provisions of a contract must be considered together to determine, if possible, the meaning intended by the parties. *Boulder Co. v. Poor,* 497 P.2d 1281, 1284 (Colo.App. 1972). Moreover, a court will not rewrite or amend contractual provisions that are clear and unambiguous, but must give effect to the plain and ordinary meaning of its terms. *Wota v. Blue Cross and Blue Shield of Colorado,* 831 P.2d 1307, 1309 (Colo.1992).

Preliminarily, applying these principles here, I conclude that the marketing and license agreements, as integrated, constitute one contract. Specifically, I am now asked to declare the respective rights and duties of the parties under paragraphs 1, 2(a), (b), and (c), 5, 13(a), and 15 of the license agreement. I begin with the question of ambiguity. As a matter of law, the provisions in paragraphs 1, 2(a), (b) and (c), 5, and 13(a) are clear, plain, unambiguous and fairly susceptible to only one meaning, *Union Rural Electric Association,* 661 P.2d at 251, but paragraph 15 is ambiguous.

At issue here is whether certain products fall under the license agreement's non-exclusive provision. The parties are in agreement as to the meaning of paragraph 1. It grants EDP a non-exclusive right to practice the Schairbaum patent limited only by territory. In paragraph 2, the contract defines the scope of exclusivity granted to Nova Mfg. Exclusivity is limited to the manufacture of products primarily constructed of wood, laminated wood or wood veneer to be sold in the stand-alone office, commercial and institutional furniture markets. Exclusivity is also limited by territory. Exclusivity is further

limited by paragraph 13(a) which I previously concluded, is unambiguous.

Paragraph 13(a), read together with paragraph 2, provides that if EDP develops a product for distribution in any market other than the stand-alone office, commercial and institutional furniture market, which is constructed primarily of wood or has a work surface constructed of any of these materials, then EDP must give Nova Mfg. the option to exercise its right of first refusal to manufacture this product on an exclusive basis in the additional market. Paragraph 13(a) clearly and unambiguously says that if EDP develops a product as defined in paragraph 2(b) for distribution, for example, in the systems market, then EDP must give Nova Mfg. a right of first refusal to obtain exclusivity over that new product in the new market to manufacture and then distribute it through Nova Office. Read in conjunction with paragraph 13, I conclude that paragraph 2 of the license agreement reserves to EDP a broad right to practice the Schairbaum Patent and the EDP inventions, and to use concurrently the trademark, except as limited by the exclusive grant to Nova Mfg. in paragraph 2, and except as limited by the right of first refusal granted to Nova Mfg. in paragraph 13 of the license agreement.

■ Nova Mfg.'s construction of paragraph 13(a) is blind to the existence of the language, "markets other than those defined in paragraph 2". Neither I nor another party can rewrite or amend contractual provisions that are clear and unambiguous, but must give effect to the plain and ordinary meaning of its terms. *Wota*, 831 P.2d at 1309. Paralax is a stand-alone product, not a systems product. Although Paralax may have a wood work surface, it was not a product developed for other than a stand-alone market in the area of office, commercial and institutional furniture. In addition, it was a developed product, because it had come out of EDP's true inventory, catalog and pricing list. Consequently, Paralax is not covered by paragraph 2 or 13(a). Accordingly, EDP may manufacture and market Paralax free from Nova Mfg.'s right of first refusal.

■ The parties further disagree as to whether EDP reserved the right to manufacture and market the retrofit kits without offering such products to Nova Mfg. under the right of first refusal in paragraph 13(a). The evidence persuades me that the retrofit kit alone is not a product that must be offered to Nova Mfg. under paragraph 13(a). However, EDP's sale of retrofit kits for use with a wood desk would violate the exclusivity provisions in paragraph 2. Consequently, this product can be sold for use only with the metal based stand-alone office, commercial and institutional product that has a laminated wood top.

Next, I turn to paragraph 15. Nova argues that I should construe paragraph 15 so as to grant to Nova Mfg. a broad right to sub-license the intellectual property made the subject of this agreement. EDP contends that paragraph 15 merely allows Nova Mfg. to grant sub-licenses necessary to implement Nova Mfg.'s own rights under the license agreement by having products made for it by subcontractors, or to have products made by Nova Mfg. and sold to Nova Office to be resold to and by others, without having those third parties exposed to claims of violating the Schairbaum patent, the EDP inventions, or the EDP trademark.

Paragraph 15 may fairly and reasonably be read to say that: 1) Nova Mfg. is granted the limited right to subcontract or sub-license to the extent necessary to implement the manufacturing and distribution scheme envisioned by the marketing and license agreements in light of the corporate structure created by Stevens, Wegman and Lechman, that is, one corporate entity established for manufacturing purposes and another for product distribution; 2) Nova Mfg. is granted the right to subcontract and sub-license only for the purpose of aiding the manufacture and distribution rights of Nova Mfg. and Nova Office; 3) its provisions apply to any future manufacturing by Nova Mfg. of new products under paragraph 13; and, 4) its provisions apply to subcontractors who simply supply components.

However, paragraph 15 can reasonably and fairly be read to grant a broader right to sublicense. It broadly states that "The licensee is expressly permitted to enter into subcontracts in the exercise of the rights and

# 1419

licenses granted herein and to grant sub-licenses to third parties as to all or any of the proprietary rights represented by the patents, inventions and trademark". Furthermore, the phrase "in the exercise of the rights and licenses granted herein" is itself ambiguous. This clause could be read as one of the limitations as stated above. On the other hand, the clause could be read to refer to paragraph 1 concerning non-exclusivity. This ambiguity leads to application of constructive aids to determine the parties' intent at the time of contracting.

The parties' testimony concerning the extent of negotiation concerning Nova's subcontracting and sub-licensing rights is in stark conflict. Phillips testified that it was never discussed except once when Lechman was insistent that there be an unlimited broad right to sub-license. Phillips testified that it was made clear to Lechman, with no room for negotiation, that such a broad right would not be granted. According to Phillips, that was the end of the subject. In contrast, Nova's witnesses testified that this issue was discussed at great length and it was clear to everyone that this was a broad grant of an unlimited right to sub-license the Schairbaum patent to others. I find and conclude that Phillips' testimony is the most credible.

The agreement's structure corroborates Phillips. First, as a separate subject, the agreement sets forth the non-exclusive rights. Next, it discusses the exclusive rights and expressly limits the degree of exclusivity in paragraphs 2(a), (b), (c), and 13(a). The parties negotiated long and hard. It would be unreasonable for them to draft and construct an agreement which begins with broad grant of exclusivity, then narrows and defines the scope of that exclusivity, only to wipe out careful limitation of scope by returning to an unlimited grant of right to sub-license in paragraph 15. Such an interpretation leads to an extreme and absurd result when considered in light of paragraph 1 and EDP's reasonable expectations.

The location of paragraph 15 in the agreement is also significant. It is situated as an administrative provision. The license agreement, as a whole, is concerned with the grant of a right to practice the 866 patent and other intellectual property. This conveyance is contained in the grant provision at the beginning of the agreement in paragraphs 1 and 2. One simply would not expect to find a grant or conveyance of a valuable substantive right in an administrative provision entitled "Binding Effect".

Moreover, if the subject of this contract was Nova Mfg's acquisition of a broad unlimited right to sub-license, then one would expect additional administrative definitions concerning the "who, what, how, where and how much" of that broad right. However, there is no contractual provision at all concerning the determination of amount of royalty or sub-licensing fees, allocation of royalty or sub-licensing fees, or any other administrative detail which one would expect to find if a key subject of this agreement were a broad sub-license right.

In addition, I cannot construe this contract against the drafter. This agreement was the product of prolonged arms-length negotiations and numerous drafts were exchanged between the parties.

■ The evidence leads me to conclude that by paragraph 15, the parties intended merely to allow Nova Mfg. to implement its own rights under the license agreement by having products made for it by subcontractors or to have products made by it sold by others without exposure to claims for patent or trademark violation and to remove any question as to responsibility for royalty payments.

■ Finally, I address paragraph 5 concerning royalties. As I have said, it is clear, plain and unambiguous. It provides that Nova Mfg. shall pay EDP a royalty equal to the lesser of six percent of the net product price to Nova's customer, who is Nova Office, or $50. To add more as suggested by EDP would be to rewrite this provision.

In sum, the provisions of paragraphs 1, 2(a), (b), and (c), 5, and 13(a) are unambiguous. However, even if such provisions were ambiguous, I would conclude from the evidence that these contractual provisions mean what I have interpreted them to mean. As for paragraph 15, the real heart of this dispute, it is ambiguous as a matter of law. I am convinced by a preponderance of the evidence that it is more probable than not

that the right to subcontract and sub-license is limited as claimed by EDP.

Accordingly, it is ORDERED, AD-JUDGED, DECREED and DECLARED that the rights of the parties are as follows:

1. Paragraph 1 of the license agreement grants to Nova Mfg., a non-exclusive right to:

   a. Practice the Schairbaum patent and the EDP inventions; and,

   b. Use the EDP trademark;

   in the manufacture, use and marketing of products which incorporate one or more aspects of the proprietary rights represented by the Schairbaum patent, the EDP inventions and the EDP trademark. This non-exclusive right is limited only by the territory which is defined in paragraph 4 of the license agreement as the United States of America, its territories, possessions, and dependencies.

2. Paragraph 2 of the license agreement grants to Nova Mfg., a limited exclusive right to:

   a. Practice the Schairbaum patent and the EDP inventions; and,

   b. Use the EDP trademark;

   in the manufacture, use and marketing of products which incorporate one or more aspects of the proprietary rights represented by the Schairbaum patent, the EDP inventions and the EDP trademark. This exclusive right is limited to the manufacture, use and sale of products primarily constructed of wood, laminated wood, or wood veneer to be sold in the stand-alone office, commercial and institutional furniture markets. This limited exclusive right is also limited by the territory which is defined in paragraph 4 of the license agreement.

3. Paragraph 2 of the license agreement reserves to EDP a broad right to practice the Schairbaum Patent and the EDP inventions, and to use concurrently the trademark, except as limited by the exclusive grant to Nova Mfg. in paragraph 2, and except as limited by the right of first refusal granted to Nova Mfg. in paragraph 13 of the license agreement.

4. The following definitions apply to this action:

   a. A product whose predominant exposed body material is wood, laminated wood or wood veneer, regardless of the material used in the work surface, is primarily constructed of wood, laminated wood or wood veneer under the definition of "products" in Paragraph 2(b) of the license agreement. A product whose predominant exposed body material is not wood, laminated wood, or wood veneer, regardless of the material used in the work surface, is not primarily constructed of wood, laminated wood, or wood veneer under the definition of "products" in paragraph 2(b) of the license agreement.

   b. The term "Network Desk" refers to a work station, such as a table or desk, having a horizontal work surface below which a CRT used at the work station in conjunction with a computer is suspended and adjustable in such a manner that it may be viewed through the work surface by the user.

5. The network desks presently included in the Paralax product line of EDP which are constructed of a metal base with a laminated wood top are neither "primarily constructed of wood, laminated wood, or wood veneer" within the meaning of paragraph 2(b) of the license agreement nor subject to the right of first refusal provision of paragraph 13.

6. EDP is not prevented by paragraph 2 of the license agreement from utilizing the Schairbaum patent, the EDP inventions or the EDP trademark to manufacture, use or market its network desks which are not primarily constructed of wood, laminated wood or wood veneer and which are offered in the stand alone office, commercial or institutional furniture markets.

7. EDP's network desks which are constructed of a metal base with a laminated wood top and are offered in the stand-alone office, commercial or institutional furniture markets do not fall within the market defined in paragraph 2(c) of the license agreement. Therefore,

EDP had no obligation to offer them to Nova Mfg. under the provisions in paragraph 13(a) of the license agreement.

8. Retrofit kits are components which when combined with work surfaces constitute products which may practice the Schairbaum patent. When assembled, a retrofit kit is positionable under a transparent portion of the work surface of a product so that a monitor which is supported by the assembled kit is visible through the transparent portion. EDP's retrofit kits are not products which must be offered to Nova Mfg. under paragraph 13(a) of the license agreement.

9. However, an EDP retrofit kit violates paragraph 2 of the license agreement if sold for use in the manufacture, use or sale of products made primarily of wood, laminated wood, or wood veneer for the stand-alone office, commercial and institutional furniture markets. Under the reservations contained in paragraph 2, EDP's retrofit kits can be sold only for use with a metal-based stand-alone office, commercial or institutional product that may have a wood, laminated wood or wood veneer work surface.

10. Paragraph 15 of the license agreement does not grant to Nova Mfg. a general right to sub-license or sub-sublicense either its non-exclusive rights granted under paragraph 1 of the license agreement, or its exclusive rights granted under paragraph 2 of the license agreement.

11. Paragraph 15 of the license agreement merely allows Nova Mfg. to grant sublicenses as might be necessary to implement its own rights under the license agreement by having products made for it by subcontractors, or to have products made by Nova Mfg. and sold to Nova Office to be resold to and by others, without having those others exposed to claims of violating the Schairbaum patent, the EDP inventions or the EDP trademark.

12. Paragraph 5 of the license agreement requires that Nova Mfg. pay EDP a royalty equal to the lesser of six percent of the net sale price to Nova Mfg.'s customer, or $50 for each unit of product. Nova Mfg.'s customer is Nova Office.