# IN THE COURT OF APPEALS OF IOWA

No. 21-0319
Filed April 27, 2022

**ANTHONY J. MANATT,**
    Plaintiff-Appellant,

**vs.**

**BRADFORD J. MANATT,**
    Defendant-Appellee.
_____

Appeal from the Iowa District Court for Delaware County, Monica Zrinyi Ackley, Judge.

Anthony Manatt appeals an order granting directed verdict to Bradford Manatt. **REVERSED AND REMANDED.**

David L. Charles and Matthew D. Callanan of Belin McCormick, P.C., Des Moines, for appellant.

Mark E. Weinhardt and David N. Fautsch of The Weinhardt Law Firm, Des Moines, for appellee.

Heard by May, P.J., and Schumacher and Badding, JJ.

**MAY, Presiding Judge.**

This is a business dispute between two brothers, Bradford (Brad) Manatt and Anthony (Tony) Manatt. Tony claims a mandatory buy-sell agreement requires Brad to sell certain shares of stock to Tony. The district court granted directed verdict in Brad's favor because (1) a condition precedent failed to occur and (2) Tony lacked standing to sue Brad. On appeal, Tony claims Brad was not entitled to directed verdict on either ground. Instead, Tony claims, he should have been granted summary judgment based on the trial record.

We conclude the district court erred in granting directed verdict in Brad's favor. Because we conclude error was not preserved, we do not reach Tony's claim that he should have been granted summary judgment based on the trial record. We reverse and remand for new trial.

## I. Background Facts & Proceedings

The Manatt family owns several construction-related companies. In the late 1980s, control over the Manatt family businesses (collectively Manaco) transferred from the first generation of Manatt owners, "M1," to the second generation of owners, "M2." Brad and Tony are part of M2. They owned the Manaco businesses with their cousins—Michael Manatt, John Manatt, and Tim Manatt—the remaining members of M2.

In 1999, Tony proposed a plan for the M2s to purchase shares in Dyersville Ready Mix (DRM). The M2s agreed. Consistent with the plan, each of the five M2s purchased 150 shares of DRM. Also consistent with the plan, five valued employees were offered the opportunity to purchase some shares of DRM with the

M2s. All five accepted and bought fifty shares each. Altogether, the ten buyers—all five of the M2s and five employees—bought 50% of DRM's shares.

In connection with this purchase, these ten shareholders executed two written agreements. One of the agreements—entitled "Bardco Trust Voting Trust Agreement" (Trust Agreement)—established a trust. Through this agreement, the shareholders assigned their shares of DRM to two trustees. They also authorized the trustees to vote all of the shares with one voice. The trust would also serve administrative functions, such as distributing dividends. But the trust would not last forever. Rather, according to the Trust Agreement, the trust would terminate (1) after twenty-five years passed, (2) if all the shares were sold to a third-party, or (3) if two of the ten shareholders died or became incapacitated. Also, the trust's "termination date" would accelerate if DRM merged or consolidated.[1]

The second agreement was entitled "Mandatory Buy-Sell Agreement" (MBS). The ten shareholders were all parties to the MBS, as was the trust. Tony and Tim signed the MBS both in their individual capacities as shareholders and also as trustees of the trust. The other eight shareholders signed only in their individual capacities.

Although the MBS and the Trust Agreement were both signed on the same day by the same ten signers, the MBS included none of the termination language

---

[1] In addition, the Trust Agreement states:
> Upon the death, disability or resignation of any one of the trustees named herein, the remaining two trustees shall continue to serve as trustees, but in the event that two or more of the trustees named herein have resigned, died or are disabled, then this Voting Trust Agreement shall be terminated.

4

found in the Trust Agreement. Indeed, the MBS included no termination clause—although a prefatory "whereas" clause said this:

> WHEREAS, the parties believe it to be in the best interests of the shareholders and the trust to insure continuity of harmonious management by restricting the transfer of the capital stock of [DRM] *during the lives of the shareholders*.

(Emphasis added.)

In any event, the MBS governed the shareholders' ownership of their DRM stock. On one hand, it placed limits on shareholders' ability to "sell, assign, pledge or otherwise transfer or encumber" the stock. On the other hand, the MBS obligated the shareholders to "offer" their "stock for sale under the restrictions of this agreement" when they leave "the employment" of Manaco.[2] The MBS also addressed *who* must be offered the opportunity to buy a departing shareholder's stock. Of particular significance here, paragraph 1.1 prevented shareholders from selling any DRM stock "without having first obtained the consent of or offered it to [DRM] in accordance with the conditions of [the MBS], or to the remaining shareholders in the event [DRM] does not exercise its right of purchase." Other provisions imposed additional constraints.

Between 2002 and 2008, five of the ten shareholders departed from Manaco. First, in 2002, Tim retired. Brad wrote to Tim regarding his commitment to terminate interests in various Manaco entities, including the "BardCo Trust." Tim's shares in DRM were distributed equally among the four remaining M2s. No record evidence shows DRM was involved in this transaction.

---

[2] More specifically, the agreement refers to leaving the employment of "the Manatt companies or a related company of itself or of MANACO Corp and its related companies."

Then, in 2005, Michael died, and his wife took ownership of his shares. She sold her shares to the three remaining M2s. No record evidence shows DRM was involved in this transaction.

In 2006, John retired. Brad wrote to John regarding his various Manaco interests. John's shares were then sold to the two remaining M2s: Brad and Tony. No record evidence shows DRM was involved in this transaction.

Finally, in 2007 and 2008 respectively, two of the employee shareholders retired. Their shares were sold to the remaining two M2s: Brad and Tony. No record evidence shows DRM was involved in these transactions.

A few years later, Brad retired from Manaco. The exact date of his retirement is not wholly clear.[3] It appears undisputed, though, that although his employment ended, Brad did not offer his DRM stock to anyone.

In 2018, Tony filed this action against Brad. In count one, Tony sought a declaratory judgment that Brad "was obligated under the terms of the [MBS] to tender his stock" in DRM. Tony also sought a declaratory judgment as to the date on which Brad's employment ended as well as a calculation of "the sum" Brad "is owed" for his shares "under the formula outlined in the" MBS.

In count two, Tony asked for an injunction "ordering Brad" to transfer "to Tony" all of Brad's DRM stock. Tony also asked the court to order Brad "to receive and accept the consideration to which the [c]ourt finds" Brad is eligible under the MBS.

---

[3] Some documents indicate 2012, while others indicate 2014.

In count three, Tony alleged Brad breached the MBS by refusing "to tender his shares for sale." As a result, Tony claimed, Brad had "receive[d] distributions from DRM to which he is not entitled." As relief, Tony asked the court to reduce the "sale price" of Brad's shares.[4]

In his answer, Brad denied most of Tony's allegations. As an affirmative defense, Brad claimed Tony lacked standing.[5]

In August 2019, Tony moved for partial summary judgment. He asked the court to enter a judgment (1) "establishing that the [MBS] was triggered by [Brad's] retirement effective December 31, 2014"; (2) "establishing that the language of the [MBS] means exactly what it says, that [Brad] was obligated to offer his shares of stock in DRM for sale" at the end of 2014; and (3) establishing "that the audited financial statements to be used are those for fiscal year end June 30, 2014 and the valuation methodology to be used in valuing the shares is that set out in the [MBS] agreement."

Brad resisted. He argued "there is a factual dispute about whether the [MBS] remains a valid and enforceable agreement after the dissolution of the Barco Voting Trust."

The district court denied Tony's motion. The court found "there is a substantial and good faith controversy over whether the contract is vague, indefinite, or uncertain as to whether it remained enforceable at the time of Brad's retirement."

---

[4] In count four, Tony sought relief concerning a covenant not to compete. It is not at issue in this appeal.

[5] Brad raised other affirmative defenses, but none are at issue in this appeal.

Because of the COVID-19 pandemic, trial was rescheduled to February 3, 2021. Days before trial—on January 29—Tony filed another motion. Tony asked the court to reject Brad's view that the MBS was no longer binding because the Trust Agreement had terminated. Instead, Tony argued, the court should "rule, as a matter of law, the [MBS] remains binding following the dissolution of the trust." But the district court never ruled on Tony's motion, and the case went to trial.

At the conclusion of Tony's case-in-chief, Brad moved for a directed verdict.[6] Brad first argued "[t]he [MBS] is unenforceable because the Bardco Voting Trust undisputedly dissolved." Brad then argued that, "[e]ven if" the MBS "is enforceable, Tony cannot enforce it" because "Tony lacks standing and is not the real party in interest."[7] This second argument relied heavily on paragraph 1.1 of the MBS, which appears to give DRM a right of first refusal to buy Brad's shares if he were to sell them. And, Brad noted, there was "no proof in the record about whether or not" DRM "would exercise [its] rights" to buy Brad's shares. So, even if Brad were obligated to sell his shares, there was no proof that Tony would end up getting them. And so, Brad argued, Tony had not proven that Brad's failure to sell his shares had caused Tony "injury in fact," an essential requirement for standing.

---

[6] Brad did not present any evidence in the defense case-in-chief. Instead, his evidence came in largely through cross-examination. After Tony concluded his case, Brad also rested.

[7] Brad also briefly mentioned a third argument based on contract law. He noted that "if [Tony] wants to say that Brad needed to sell his shares to" Tony, "then [Tony] just loses on the contract, because the contract doesn't say that." Although this argument is doctrinally separate from Brad's standing argument, the same operative question—was Brad required to sell shares to Tony—is at the heart of both arguments. So we need not address this contract law issue separately.

Tony resisted Brad's motion. Among other things, Tony argued that DRM's apparent right-of-first-refusal was a mere "scrivener's error." It was contrary to the parties' "course of dealing" as well as "the interpretation" of the MBS that had been used by Brad "and everybody else up to this point."

Tony also asked to make a directed verdict motion of his own. Before Tony could make his motion, though, the district court granted Brad's motion for directed verdict on the record. The court followed up with a written ruling. The ruling suggested that the court had accepted both of Brad's directed-verdict arguments. On one hand, the court apparently accepted Brad's contention that there had been a "failure of condition precedent" because the trust "had been terminated by its terms" as a result of "the retirement/death of more than three of its members and [DRM's] merger with Apex Concrete in 2013." In addition, the court apparently found Tony lacked standing because he "did not establish a direct injury as a result of the conduct at issue."[8]

Tony filed a motion to reconsider under Iowa Rule of Civil Procedure 1.904(2). Tony asked the court to "make an express finding" on his January 29 motion. Specifically, Tony asked the court to "explicitly hold[]" that the court "reject[ed]" the arguments contained in his January 29 motion. Additionally, to conform the court's ruling to the language of the Trust Agreement, Tony asked the court to modify its ruling to state that "the BardCo Voting Trust had been terminated by the 'retirement/death of two of its members.'"

---

[8] There is some uncertainty as to whether the court also relied upon a real-party-in-interest theory. We need not resolve this uncertainty.

The district court declined to amend or enlarge its ruling. This appeal followed.

## II. Discussion

On appeal, Tony argues the district court erred in (1) granting Brad's motion for directed verdict and (2) failing to grant Tony's summary judgment motion based upon "the entire trial record," including admissions Brad made in his trial testimony. We begin with the directed verdict ruling.

## A. Directed Verdict

### i. Standard of Review

"We review a ruling on a motion for a directed verdict for correction of errors at law." *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017). "A directed verdict is required 'only if there was no substantial evidence to support the elements of the plaintiff's claim.'" *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009) (quoting *Bellville v. Farm Bureau Mut. Ins.*, 702 N.W.2d 468, 472 (Iowa 2005)). Evidence is substantial "[w]hen reasonable minds would accept the evidence as adequate to reach the same findings." *Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008). "Where reasonable minds could differ on an issue, directed verdict is improper and the case must go to the jury." *Stover v. Lakeland Square Owners Ass'n*, 434 N.W.2d 866, 873 (Iowa 1989). Thus, we must "decide whether the district court's determination that there was or was not sufficient evidence to submit the issue to the jury was correct." *Stender*, 897 N.W.2d at 501. In doing so, we consider the record evidence in the light most favorable to the nonmoving party, considering all reasonable inferences that could be fairly drawn by the jury.

*Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013).

### ii. Issues Presented

The district court granted directed verdict for two reasons:

1. The MBS could not be enforced against Brad because (a) the trust's existence was a condition precedent to enforcement and (b) the trust no longer exists.

2. Even if the MBS were enforceable, Tony still lacked standing to enforce it here.

Tony claims the district court was wrong on both points. We address each in turn.

### *1. Condition precedent*

"Conditions precedent are . . . those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." *Khabbaz v. Swartz*, 319 N.W.2d 279, 283 (Iowa 1982) (alteration in original) (citation omitted). Here we consider whether—as a matter of law—the trust's continued existence was a condition precedent to the enforcement of the MBS. We start by considering Tony's contention that, because the Trust Agreement and the MBS were signed the same day, the trust's existence *could not be* a condition precedent. This is so, Tony argues, because the definition of "conditions precedent" is limited to "facts and events" that "occur[] *subsequently* to the making of" the contract. (Emphasis

added.)  Because the trust came into existence *at the same time* as the MBS, it did not *come into* existence "subsequently" to the MBS's "making."

But while Tony focuses on the trust's creation, Brad is focused on the trust's *continued* existence.  Brad claims the trust's continued existence was the condition precedent.  And this does not seem impossible.  Even though the trust existed when the MBS was signed in 1999, there was no guarantee it would still exist *later*, e.g., when Brad retired in 2014.[9]  Its *continued* existence in 2014 was a "fact" or "event" that had to occur—or not occur—"subsequent[] to the making of" the MBS in 1999.  So the trust's continued existence *could be* a condition precedent.[10]

---

[9] Or 2012, depending on what evidence you follow.

[10] We note these observations from Williston on Contracts:

> It is ordinarily said that a condition must be something future and uncertain, and it is undoubtedly true that at least from the standpoint of the parties, both futurity and uncertainty are necessary elements.  If to their knowledge the event has either already happened or cannot possibly happen, the promise is either absolute or nugatory from the outset.  This is true whether the parties are aware of the facts or not.  A promise to pay for a horse if it is sound could only be regarded by an omniscient person as either no promise or as an absolute promise, depending on whether the horse was, when the bargain was struck, in fact sound or unsound.  But the parties to the transaction undoubtedly look at it as involving a promise subject to a condition because *their knowledge of the horse's soundness will not be complete until the future*, and the common law accepts that point of view.  And the parties' agreement could mean that the horse must be sound as of the time the contract was made and *will remain sound until delivery* or that, whatever the health of the horse now*, it will be sound when it is delivered to the buyer*.  Which meaning is intended is a matter of interpretation.

13 Williston on Contracts § 38:1 (4th ed.) (emphasis added) (footnotes omitted).

Just as the *future* "soundness" of a horse can be a condition to performance *even if* the horse *was* "sound" when a contract of sale was made, the *future* existence of the trust could be a condition precedent even though the trust existed when the MBS was signed.

But *was* the trust's continued existence a condition precedent to Brad's obligation to sell his shares under the MBS? Our cases say that "[a] determination that a condition precedent exists depends not on the particular form of words used, but upon the intention of the parties gathered from the language of the entire instrument." *Id.* (citation omitted). In other words, to determine if the trust's existence was a condition precedent, we must interpret the MBS contract.

In general, courts "enforce contracts as written, plain and simple." *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 667 (Iowa 2008) (Appel, J., specially concurring); *see Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006) ("Generally, contracts are interpreted based on the language within the four corners of the document."). Often, though, "when interpreting contracts, we may look to extrinsic evidence, including the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011) (cleaned up). "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact." *Id.* (citation omitted).

Still, we begin by considering the words of the MBS. *Id.* ("The cardinal rule of contract interpretation is to determine the intent of the parties at the time they entered into the contract. The most important evidence of the parties' intentions at the time of contracting is the words of the contract." (internal citation omitted)). From our review of those words, we find relatively limited support for the idea that

the trust's existence was a condition precedent—an essential prerequisite—to Brad's obligation to sell his shares upon retirement. Brad's obligation to sell was created by the first sentence in paragraph 1.3 of the MBS. It states: "Any stockholder leaving the employment of the Manatt companies . . . shall offer his stock for sale under the restrictions of this agreement." Nothing in this language suggests that Brad's obligation to sell was conditioned upon the existence of the trust—or upon anything else except the end of his "employment" with "the Manatt companies."

Nor do we find such a limitation elsewhere in the MBS. As Tony correctly observes, "no provision" in the MBS expressly states that "the duty to offer shares for sale is dependent on the continued existence of the trust." Brad does not challenge this.

It is true, as Brad points out, that several provisions of the MBS refer to the trust. For example, as Brad notes, the trust was a party to the MBS. Brad also points to various MBS provisions that gave the trust *opportunities* to purchase shares from shareholders in certain circumstances. And other provisions obligated the trust to buy shares in the event of a shareholder's death or disability. Plus, as Brad notes, the MBS includes an elaborate formula for determining the price of stock sold under the MBS. A "Fair Market Committee" is to play a role in determining the price. According to the MBS, the committee shall consist of three "stockholders elected at each annual meeting by the stockholders and members of the voting trust."

But Brad does not argue that any of these references to the trust—when viewed individually—shows that Brad's obligation to sell was dependent on the

trust's existence. He does not suggest that any of these references—taken alone—can be reasonably interpreted to mean that.

Instead, Brad takes a broader view. He argues the two agreements are "joined at the hip." The MBS "depended on" the trust in "numerous ways, in some of which, such as passing of stock upon death or disability, the [MBS] simply could not operate without the" trust. So, Brad contends, "[i]t is plain that the parties to these agreements, at the time that they were entered, intended for the" MBS and the trust "to operate together." And so, Brad asks us to conclude, because the trust has terminated, the MBS is void and—therefore—cannot require Brad to sell his stock.

For two reasons, we do not believe the text of the MBS requires us to adopt Brad's position. First, nothing in the MBS *says* the MBS terminates when the trust terminates. As Brad admits, "[t]here is no contract term anywhere in the" MBS "stating its duration." Unlike the Trust Agreement—which we will discuss more in the context of extraneous evidence—the MBS contains no explicit termination clause. Indeed, if we look only at the MBS's text, we find only one suggestion as to its anticipated duration. In a preliminary recital paragraph, the MBS states:

> WHEREAS, the parties believe it to be in the best interests of the shareholders and the trust to insure continuity of harmonious management by restricting the transfer of the capital stock of [DRM] *during the lives of the shareholders.*

(Emphasis added.)

As Tony points out, this passage suggests the MBS was intended to function "during the lives of the shareholders," plural. And the phrase "during the lives of the shareholders" cannot reasonably be interpreted to mean "until the trust

terminates." Of course, Brad is right that we should not put too much weight on a preliminary recital that does not appear elsewhere in the contract. *See Fisher Controls Int'l, L.L.C. v. Pharmacia Corp.*, No. 07-0003, 2008 WL 373636, at *5 (Iowa Ct. App. Feb. 13, 2008) ("A preliminary recital, which is an explanation of the circumstances surrounding the execution of the contract, does not become a binding obligation unless so referred to in the operative portion of the instrument." (citation omitted)). At the same time, preliminary recitals *are* "explanation[s] of the circumstances surrounding the execution of the contract." *Id.* (citation omitted). They can shed *some* useful light. *See id.*; *see also Engineered Data Prods., Inc. v. Nova Off. Furniture, Inc.*, 849 F. Supp. 1412, 1417 (D. Colo. 1994) ("Recitals and titles, not being strictly part of the contract, cannot extend contractual stipulations, though they may have material influence on the construction of the instrument and the determination of parties' intent."). And a recital that shows the MBS was intended to function "during the lives of the shareholders" weighs against the idea that the MBS terminates with the trust.

Second, we cannot adopt Brad's suggestion that—without the trust—the MBS cannot function in this particular case. We recognize Brad's point that some features of the MBS assume the trust's existence. For instance, in some situations, the trust is granted rights of first refusal to buy stock. So, if the trust doesn't exist, the trust (obviously) wouldn't exercise its right of first refusal in those situations. Put another way, if the trust has expired, the MBS may sometimes function *differently* than it would with the trust involved. But this does not compel

the conclusion that—without the trust—the MBS cannot function *at all*.[11]  And, most significantly, it does not compel the conclusion that the MBS could not require Brad to sell his shares.

So, looking only at the words of the MBS, we do not conclude the trust's expiration automatically and necessarily relieved Brad of his obligation to sell his shares.  Moreover, extrinsic evidence supports the view that Tony's obligations under the MBS could outlive the trust.  For example, as already mentioned, the Trust Agreement—which was signed on the same day as the MBS—is a separate document.  This separation might imply the two documents were meant to function separately.  Also, the Trust Agreement—which, again, was executed the same day as the MBS—included explicit language that guaranteed the trust would expire upon the occurrence of one or more specified events, e.g. the passage of twenty-five years.  A rational juror could reason that if the signatories had intended the MBS to have the same durational limits as the trust, they would have expressly stated those durational limits in the MBS's text.  In any event, the signatories surely would *not* have included a recital that signaled their intent for the MBS would "restrict[] the transfer of the capital stock of the corporation *during the lives of the shareholders*."  (Emphasis added.)  Rather—a rational juror could infer—the signatories would have included a recital of their intention that the MBS restrict stock transfers only during *the trust's* lifetime.

All things considered, then, we cannot conclude *as a matter of law* that the continued existence of the trust was a condition precedent to enforcement of the

---

[11] Although dogs do best with four legs, some three-legged dogs can still frolic.

MBS against Brad in this case. The district court erred by granting directed verdict on this basis.

*2. Standing*

Next, we consider the district court's alternative ground for granting directed verdict, Tony's lack of standing. "Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 115 n.31 (1979). In *Gladstone Realtors*, for example, the United States Supreme Court reversed a grant of summary judgment and remanded for trial because there were factual questions as to whether plaintiffs had standing. *Id.* at 115–16. Similarly, the issue here is whether—based on the trial record—there was a genuine issue of material fact as to whether Tony had standing to pursue his claims. If so, we must reverse for a new trial. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (noting that, because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation").

In Iowa state courts, the standing requirement obliges the complaining party to prove that they "(1) have a specific personal or legal interest in the litigation and (2) [are] injuriously affected." *Iowa Citizens for Cmty. Improv. v. State*, 962 N.W.2d 780, 790 (Iowa 2021) (citation omitted). Iowa's "injuriously affected" prong

incorporates the "three-part test" established by the United States Supreme Court in *Lujan*. *See id.* (noting Iowa's incorporation of "the *Lujan* three-part test"). This means that, to fulfill Iowa's "injuriously affected" requirement, a plaintiff must demonstrate "not only (1) injury in fact, but also that the injury in fact (2) is fairly traceable to the defendants' conduct and (3) is likely to be redressed by a favorable decision." *Id.*

Here, it seems undisputed that Tony has a "specific personal or legal interest in th[is] litigation," through which Tony hopes to force Brad to sell his shares so that Tony can buy them. *See id.* Rather, the fight is over the "injuriously affected" requirement. Brad maintains that—even assuming the MBS survived the trust's demise—the MBS does not authorize Tony to buy Brad's shares. Rather, DRM has a right of first refusal—and the record contains no evidence that DRM would not buy the shares if given the chance. So, Brad contends, Tony cannot show Brad's failure to sell the shares has injured Tony.

Tony disagrees. He claims he can show injury because the MBS permits him—not DRM—the right to buy Brad's shares.[12]

To decide who is correct, we turn again to the task of contract interpretation. As explained, we believe that—notwithstanding the trust's apparent demise—there is at least a fact question as to whether the MBS still survives and, more to the point, whether it obligates Brad to sell his shares to someone. But *to whom* would

---

[12] In the alternative, Tony contends that (1) even if DRM has a right of refusal, an order forcing Brad to sell his shares would redress Tony injuries by creating a possibility that Tony could buy Brad's shares and (2) in any event, his declaratory judgment claim survives because it is not subject to the same standard as other claims. Because we find Tony prevails on his primary argument, we do not reach these alternatives.

Brad have to sell his shares? Brad finds the answer in paragraph 1.1 of the MBS.

It states in pertinent part:

> The stockholders shall not sell, assign, pledge or otherwise transfer or encumber in any manner or by any means whatever any interest in all or any part of the capital stock of [DRM][13] now owned or hereafter acquired by them without having first obtained the consent of or offered it to [DRM] in accordance with the conditions of this agreement, or to the remaining shareholders in the event the corporation does not exercise its right of purchase.

In Brad's view, paragraph 1.1 means that he was never obligated to sell *to Tony*. Rather, his obligation (if any) was to offer his stock to DRM. And Tony cannot assert DRM's harm as his own. So Tony cannot show he was "injuriously affected" by Brad's failure to sell his shares.

Tony does not deny that—by its plain language—paragraph 1.1 places DRM ahead of him in line to buy Brad's stock. Rather, Tony suggests we should essentially discard this language as a "scrivener's error."[14] Brad responds that a scrivener's error would need to be corrected through judicial reformation, a form of equitable relief. *See, e.g.*, *Koehn v. Koehn Bros. Farms, LLC*, No. 13-1036, 2014 WL 4230200, at *11 (Iowa Ct. App. Aug. 27, 2014) (correcting "scrivener's error" through equitable reformation). But Tony has not advanced a reformation theory before the district court or on appeal.

Instead, Tony advances an interpretative theory. Tony contends that Brad's interpretation of paragraph 1.1 is "contrary to the parties' twenty-plus years of

---

[13] The text of paragraph 1.1 says "the corporation." Elsewhere, the MBS defines "the corporation" to mean "Dyersville Ready Mix."

[14] Note that Tony does not claim paragraph 1.1 is ambiguous. Rather, Tony's position is that paragraph 1.1 is unambiguously wrong because of a scrivener's error.

history, the parties' intention in adopting the [MBS], and the parties' course of dealing."  By this, we think Tony refers to three bodies of evidence.

First, Tony notes that—in prior business dealings—the Manatts have used mandatory buy-sell agreements to enforce a "last man standing" approach.  *Cf. Course of Dealing*, *Black's Law Dictionary* (11th ed. 2019) ("An established pattern of conduct between parties in a series of transactions (e.g., multiple sales of goods over a period of years).  If a dispute arises, the parties' course of dealing can be used as evidence of how they intended to carry out the transaction.").  The parties sometimes call this approach "the Manatt way."  It means that, as each Manatt retires, he sells his interests in any Manatt-owned business to those Manatts who are still active in the business.  This way, the last active Manatt is left with "100 percent ownership."

Second, Tony points to the parties' performance under the MBS at issue in this case.  *Cf. Course of Performance*, *Black's Law Dictionary* (11th ed. 2019) ("A sequence of previous performance by either party after an agreement has been entered into, when a contract involves repeated occasions for performance and both parties know the nature of the performance and have an opportunity to object to it.  A course of performance accepted or acquiesced in without objection is relevant to determining the meaning of the agreement.").  He notes there is no evidence that DRM ever asserted or was offered a right of first refusal when shareholders departed and transferred their stock.  Instead, departing

21

shareholders offered all of their shares to "the remaining active members of the [M2] generation," including Tony and Brad.[15]

Finally, Tony notes that Brad openly admitted that only Tony—and not DRM or anyone else—has the right to buy Brad's stock. At trial, Brad was asked if Tony "is the only one that had the right to buy" his stock. Brad said "[t]hat's true."

Tony argues that, when taken together, this extrinsic evidence permits the inference that the parties intended for Tony—who is the last Manatt standing, so to speak—to have the right to buy Brad's stock after Brad's retirement. And we understand Tony's point. Even so, we acknowledge some hesitation as to how we should handle Tony's extrinsic evidence. As noted, Tony does not dispute that— according to its plain terms—paragraph 1.1 gives *DRM* the first opportunity to buy Brad's stock. Tony does not claim paragraph 1.1 is ambiguous on this point. And some authorities suggest that—*unless* contractual language "is ambiguous"—we must simply "enforce the contract as written," without regard to matters outside "the four corners of the document." *DuTrac Cmty. Credit Union v. Radiology Grp. Real Est., L.C.*, 891 N.W.2d 210, 216 (Iowa 2017) (noting that "[*i*]*f the language of the contract is ambiguous*," courts then "engage in interpretation to determine 'the meanings attached by each party at the time the contract was made'" and, "[t]o the extent necessary to reveal the parties' intent, extrinsic evidence is admissible" (emphasis added) (citation omitted)); *see Clinton Physical Therapy Servs.*, 714 N.W.2d at 615 (noting "contracts are [generally] interpreted based on *the language*

_____

[15] Brad argues that, when other shareholders retired, their stock transfers were not conducted *under the MBS*. Rather, they were side deals outside the MBS. We do not believe we can resolve this factual dispute as a matter of law.

*within the four corners of the document*" and further noting that "*when the language is ambiguous*," courts "must engage in a process of interpretation," which may include admission of "extrinsic evidence" (emphasis added)). Indeed, our appellate rules include the proposition that, "[i]n the construction of written contracts, the cardinal principle is that the intent of the parties must control, *and except in cases of ambiguity*, this [intent] is *determined* by what the contract itself says." Iowa R. App. P. 6.904(3)(n) (emphasis added). And even Tony's appellate brief mentions the rule that, "'[a]bsent ambiguity, intent'—the meaning of the contract—'is determined by the written words of the contract itself.'" *Hofmeyer v. Iowa Dist. Ct.*, 640 N.W.2d 225, 228 (Iowa 2001). All of this suggests that, "except in cases of ambiguity," we must focus only on "what the contract itself" says—*not* on extrinsic evidence, which, by definition, is outside "the contract itself." Iowa R. App. P. 6.904(3)(n); *see Evidence, Black's Law Dictionary* (11th ed. 2019) (defining extrinsic evidence as "[e]vidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement."); *see also Smidt v. Porter*, 695 N.W.2d 9, 21 (Iowa 2005) ("It is a fundamental and well-settled rule that when a contract is not ambiguous, we must simply interpret it as written."); *Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797 (Iowa 1999) ("*If* the contract is ambiguous and uncertain, extrinsic evidence can be considered to help determine the intent." (emphasis added)); *Dickson v. Hubbell Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997) ("*If* the language is found to be ambiguous, extraneous evidence is admissible as an aid to interpretation of the contract." (emphasis added)); *Uhl v. City of Sioux City*, 490 N.W.2d 69, 73 (Iowa

Ct. App. 1992) ("Outside evidence is admissible to construe the language of a contract *after the language is found to be ambiguous* and subject to two different reasonable interpretations." (emphasis added)).

As both parties acknowledge, though, other supreme court opinions support a different approach. The parties pay the most attention to *Pillsbury Co v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008),[16] a case that the district court also cited. In *Pillsbury*, the court observed that "[l]ong ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract." 752 N.W.2d at 436. And the court made clear that "[a]*ny* determination of meaning or ambiguity *should only be made* in the light of" available extrinsic evidence "of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Id.* (alteration in original) (emphasis added) (citation omitted). So while "the words of the agreement are still the most important evidence of the [parties'] intentions at the time they entered into the contract," we must "allow extrinsic evidence to aid in the process of interpretation." *Id.*

*Pillsbury* was not an outlier. Many other opinions have said the same or similar things. *See, e.g.*, *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855

---

[16] At various points in their briefing, both parties acknowledge that *Pillsbury* authorizes the court to consider extrinsic evidence when interpreting the MBS. Tony cites *Pillsbury* as "allowing for the consideration of extrinsic evidence to inform the [c]ourt of the parties' intent." Tony also cites *Pillsbury* for the proposition that, "[t]o determine the parties' intent and the contract's meaning, factfinders can consider, *inter alia*, the course of dealing between the parties, including the manner in which the parties interpreted the contract in the past." Brad cites *Pillsbury* and acknowledges "Tony is correct that the course of performance can be used to interpret a contract."

N.W.2d 722, 727 (Iowa 2014) ("Because a lease is a contract, we apply ordinary contract principles to determine its meaning and legal effect. We thus consider the lease as a whole *as well as any pertinent extrinsic evidence.*" (emphasis added) (internal citation omitted)).

*Peak* is a useful example. 799 N.W.2d at 535. In *Peak*, the question was whether to enforce a release that was signed as part of a personal injury settlement. *Id.* at 539. Our supreme court concluded that the language of the release "unambiguously" discharged one defendant's liability. *Id.* at 543–44. Even so, the court considered the available extrinsic evidence to see whether it showed that the release's unambiguous language had failed to reflect the signatories' "mutual intent." *Id.* at 544.

*Peak*'s lesson is that—even when contractual language is not "facially ambiguous"—Iowa courts may "look to extrinsic evidence" to "ascertain" the contracting parties' "*mutual* intent." *Id.* And we think *Peak* represents the current state of Iowa law. It would appear, then, that "even if there is no ambiguity" in paragraph 1.1, "we can also consider extrinsic evidence" to determine the parties' mutual intent in entering the MBS. *See Deppe v. Deppe*, No. 16-0310, 2017 WL 2875865, at *5 (Iowa Ct. App. July 6, 2017).

At the same time, we also acknowledge Brad's point about the parol evidence rule. When an agreement is "fully integrated," "a party may not use extrinsic evidence . . . 'solely to vary, add to, or subtract from the agreement.'" *Cannon v. Bodensteiner Implement Co.*, 903 N.W.2d 322, 329 (Iowa 2017) (citation omitted). Even when an agreement is only partially integrated, "the parol evidence rule bars proof of contradictory terms." *Chau Pham v. Nguyen*, No. 09-

0120, 2009 WL 2392919, *2 (Iowa Ct. App. Aug. 6, 2009). And this is plainly a case in which a party seeks to use extrinsic evidence to *contradict*—and not merely supplement—the written terms of the MBS: Although paragraph 1.1 unambiguously gives DRM *the first* right to buy Brad's shares, Tony hopes to show DRM has *no* right to buy Brad's shares. This sort of contradiction is impermissible *if* the MBS is completely or partially integrated.

But *is* the MBS integrated? The issue was not raised or ruled upon in the district court.[17] So we question whether we should consider the issue now. *See, e.g.*, *State ex rel. Dickey v. Besler*, 954 N.W.2d 425, 432 (Iowa 2021) ("It is well-settled that we may affirm a district court ruling on an alternative ground *provided the ground was urged in that court*." (emphasis added) (citation omitted)). In any event, "[w]hether or not a written agreement is integrated is a question of fact to be determined by the totality of the evidence." *Whalen v. Connelly*, 545 N.W.2d 284, 290 (Iowa 1996) (citing Restatement (Second) of Contracts § 209, cmt. c (Am Law. Inst. 1981)); *see Kroblin v. RDR Motels, Inc.*, 347 N.W.2d 430, 433 (Iowa 1984) (noting "extrinsic evidence may be admitted to show that a writing is not an integrated agreement"). And based on the current record and briefing, we cannot readily determine the issue as a matter of law. So, at this procedural stage, we decline to find the parol evidence rule prohibits Tony's proposed use of extrinsic evidence.[18]

---

[17] Brad concedes that he made no parol-evidence objections at trial. Likewise, we find no place in the record where Brad argued the MBS was partially or fully integrated.

[18] The parties may address this issue on remand.

On the current record, then, we believe Tony's extrinsic evidence may be considered notwithstanding the MBS's apparent lack of ambiguity. *See Peak*, 799 N.W.2d at 535; *Pillsbury*, 752 N.W.2d at 436. And based upon that evidence—including the Manatts' prior course of dealing (the "last man standing" approach), the actual course of performance under this MBS, and (especially) Brad's admission under oath—we believe there is a genuine issue of material fact as to whether the parties intended Tony to have the right to purchase Brad's shares. So we also conclude there is a genuine issue of material fact as to whether Tony was "injuriously affected" by Brad's failure to sell the shares. *See Iowa Citizens*, 962 N.W.2d at 790. Accordingly, the district court erred in concluding Tony lacked standing as a matter of law. We reverse the grant of directed verdict in Brad's favor.

**B. Summary Judgment**

Tony also argues that the district court erred by failing to grant his summary judgment motion based upon "the entire trial record," including admissions Brad made in his trial testimony. But we find no place where this particular request was raised and ruled upon by the district court. So we decline to consider the issue now. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

**III. Conclusion**

Because Brad was not entitled to a directed verdict, we must reverse and remand for a new trial.

**REVERSED AND REMANDED.**